

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/06/2014

| | | |
|---|---|---|
| IN RE: | § | |
| **ATP OIL & GAS CORPORATION** | § | **CASE NO: 12-36187** |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **NGP CAPITAL RESOURCES COMPANY** | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 12-03443** |
| | § | |
| **ATP OIL & GAS CORPORATION** | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

NGP Capital's Motion for Summary Judgment is denied. (Case No. 12-3443, ECF No. 77).

### Background

This motion for summary judgment relates to whether certain prepetition transactions between ATP (the debtor in the bankruptcy case 12-36187) and NGP Capital were real property conveyances (as they are characterized in the respective documents) or were actually debt instruments. NGP Capital filed a Motion for Summary Judgment on February 11, 2013 seeking a ruling on whether the Conveyance(s) between ATP and NGP Capital is a disguised financing transaction or a true sale of incorporeal immovable (real) property interests. (Case No. 12-3443, ECF No. 77).

ATP entered into at least sixteen agreements that were characterized as ORRI conveyances. (Case No. 12-36187, ECF No. 15-1). ATP now argues that these transactions are "disguised financing" transactions. The individual characteristics of these transactions differ,

1 / 32

sometimes greatly, and therefore the ultimate outcomes may vary.  Some prior history is necessary to place this motion in its proper context.

<strong>The Contested ORRIs and NPIs</strong>

ATP noted in its first-day motions that it "has outstanding trade and other payables in excess of $170 million and outstanding balances under the ORRIs and NPIs in excess of $489 million."  (Case No. 12-36187, ECF No. 6 at 6).  ATP now disputes whether these interests are real property interests (in the form of ORRIs or NPIs) under applicable law.[1]

 Generally, an ORRI is "[a]n interest in oil and gas produced at the surface, free of the expense of production, and in addition to the usual landowner's royalty reserved to the lessor in an oil and gas lease."  8 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS OIL AND GAS LAW 757 (2012).  The Bankruptcy Code defines a term overriding royalty to be "an interest in liquid or gaseous hydrocarbons in place or to be produced from particular real property that entitles the owner thereof to a share of production, or the value thereof, for a term limited by time, quantity, or value realized."  11 U.S.C. § 101(56A).

An NPI is "a share of gross production from a property, measured by net profits from operation of the property."  *Id.* at 646; *see also La. Land & Explor. Co. v. Donnelly*, 394 F.2d 273, 277 (5th Cir. 1968) (using the same definition and quoting the Williams & Meyers treatise).[2]

---

[1] The transaction documents related to each of the four interests at issue refer to the interests as ORRIs.  In its first-day motions, ATP referred to these interests as ORRIs and NPIs.  (Case No. 12-36187, ECF No. 15 at 7).  ATP further noted, however, that it reserved its rights to challenge the nature of these interests in the future.  (*Id.* at 8 n.2) ("[T]he Debtor is continuing to review its agreements related to the [ORRIs and NPIs].  As such, the Debtor expressly reserves the right to amend and/or supplement Exhibit A including, without limitation, in order to add, remove, and/or recharacterize any of the agreements and/or interests listed therein.").

[2] These are general definitions of ORRIs and NPIs provided for illustrative purposes.  These definitions do not necessarily include all interests that would be considered ORRIs or NPIs under applicable law, and will surely be further and better defined as this litigation progresses.

The interests at issue relate to outer-continental shelf lands leased by ATP (hereinafter "OCS Leases") from the United States under the Outer Continental Shelf Lands Act (43 U.S.C. §§ 1331 *et seq.*).  (*See, e.g.*, Case No. 12-3516, ECF No. 4-24 at 34).  ATP received more than $700 million as a result of the various ORRI and NPI transactions.  (Case 12-36187, ECF No. 4 at 5).

ATP, in its capacity as debtor in possession, argues that these are "disguised financing" transactions.  That is, although characterized in the relevant documents as ORRIs, the economic substance is that of a financing arrangement.  In addition to the NGP Capital transaction, ATP has made the same argument with regards to ATP transactions with several other parties, including TM, Keba, Macquarie, Diamond, and Seacor:

> An actual controversy exists between ATP and [NGP Capital] regarding the proper characterization of the Conveyance and related agreements, including whether the Conveyance and related agreements constitute a "disguised" financing arrangement, which controversy directly affects the administration of ATP's bankruptcy estate and the rights and obligations of the parties.
>
> The economic realities of the transactions contemplated by the Conveyance and the related agreements confirm that the transactions are a disguised financing arrangement.
>
> For instance, ATP's continuing obligations following the Conveyance, including, without limitation, its obligation to operate the properties, to market production from the properties, and to collect and dispense the proceeds of sale of production from the properties, are obligations normally associated with ownership.
>
> The other operative provisions of the Conveyance and related agreements are consistent with a traditional financing arrangement and not a sale or absolute conveyance of a property interest.

(Adversary Proceeding 12-3517, ECF No. 18 at 23).

Additionally, ATP argues that it lacked the legal authority to convey ORRI or NPI interests:

> Under OCSLA, the title that ATP acquired from the Government pursuant to the OCS Leases was that of a lessee, and did not constitute absolute title in the Leased Lands.
>
> The OCS Leases are simply executory contracts and/or unexpired leases.
>
> As a lessee, ATP could convey to [NGP Capital] (either directly or by assignment) no greater title in the OCS Leases and the Hydrocarbons produced therefrom than that which it obtained from the Government.
>
> Because the OCS Leases are executory contracts and/or unexpired leases and ATP could convey no greater title to the OCS Leases than it received, the Conveyances and related agreements with Diamond are derivatives of ATP's executory contracts or unexpired leases.

(*Id.* at 29).

NGP argues that the characterizations contained in the relevant documents accurately describe the nature of these transactions—conveyances of real property interests (in the form of ORRIs) under applicable law.  (Adversary Proceeding 12-3443, ECF No. 77).  It disputes that these are "disguised financing" transactions.  (*Id.*).  Thus, NGP necessarily argues that ATP had the ability to convey ORRI interests.

### NGP-ATP Transaction

NGP purchased Term Overriding Royalties related to six OCS Leases on two properties, known as the Gomez Properties and the Telemark Properties, for a total purchase price of $65,000,000.00.[3] (Case No. 12-3443, ECF No. 77 at 7). Under the agreement, NGP is entitled to receive its proportionate share of the proceeds of any and all hydrocarbons produced, saved, and sold from the Properties for each production month. *Id.*

On June 20, 2011, ATP and NGP entered into a transaction that included agreements labeled "Conveyance of Term Overriding Royalty Interest" and "Purchase and Sale Agreement"

---

[3] The total purchase price consists of an initial $25,000,000.00 payment, followed by two subsequent payments of $15,000,000.00 and $25,000,000.00, related to amended agreements that were executed between the parties to increase NGP's overriding royalty interests.

(collectively "Original Conveyance."). (Case No. 12-03443, ECF No. 110 at 7). Under the Original Conveyance, ATP purported to convey to NGP a limited term ORRI payable out of three OCS Leases, Mississippi Canyon 711, 754, and 755, in exchange for $25,000,000.00. The parties agreed that the Term ORRI remained in effect until the cumulative Royalty Payments received by NGP equaled the Total Sum. The "Total Sum" is defined in the Original Conveyance as "the full amount of the Primary Sum; plus an amount equal to the interest (the "Notional Interest") which would accrue at the Notional Rate on the unliquidated balance of the Primary Sum outstanding from time to time during the period from the date of execution of this Conveyance…" (ECF No. 77-1 at 45).

On December 29, 2011, the Term ORRI was amended when the parties executed the "First Supplement and Amended Conveyance of Term Overriding Royalty Interest" and "First Supplemental Purchase and Sale Agreement" (collectively "First Supplemental Conveyance."). Under the First Supplemental Conveyance, the parties agreed to amend the Term ORRI by increasing the Primary Sum by $15,000,000.00 and amending the Notional Interest Rate.

On July 2, 2012 the Term ORRI was again amended when the parties executed a "Second Supplement and Amended Conveyance of Term Overriding Royalty Interest" and "Second Supplemental Purchase and Sale Agreement" (collectively "Second Supplemental Conveyance."). Under the Second Supplemental Conveyance, the parties agreed to amend the Term ORRI by increasing the Primary Sum by $25,000,000.00 and extending the Term ORRI to cover OCS Leases AT63, MC941, and MC942.

**Bifurcated Proceedings**

On November 29, 2012, this Court bifurcated this adversary proceeding into two phases. (Case No. 12-03433, ECF No. 57). The first phase of the adversary proceeding is generally limited to the issues of (i) whether the NGP Conveyance constituted outright transfers of ownership of property such that the conveyed interests are not property of ATP's estate and (ii) whether the conveyances of the subject interests are executory contracts or leases which the Debtor may reject under 11 U.S.C. § 365.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate:  (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the

fact.[4]  Fed. R. Civ. P. 56(c)(1).  The Court need consider only the cited materials, but it may consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  The Court should not weigh the evidence.  A credibility determination may not be part of the summary judgment analysis.  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).  However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact."  *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial.  *Malacara*, 353 F.3d at 403.  Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact.  *Sossamon*, 560 F.3d at 326.  The non-moving party must cite to specific evidence demonstrating a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  The non-moving party must also "articulate the manner in which that evidence supports that party's claim."  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).  Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim.

---

[4] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

*Norwegian Bulk Transp. A/S*, 520 F.3d at 412.   Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case.   *Celotex*, 477 U.S. at 324.   The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim.   *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## <u>Analysis</u>

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (U.S.N.C. 1979).   Unless Louisiana law is inconsistent with federal law on the issues in this adversary proceeding, Louisian law is applicable to this dispute. The OCS Leases to which the Conveyances and the ORRIs and/or NPIs relate are located in federal waters in the Gulf of Mexico off the coast of, and adjacent to, Louisiana. *See* 43 U.S.C. § 1333(a)(2)(A); *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990) ("We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary."); *Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) ("Congress declared that '[t]o the extent that they are applicable and not inconsistent with [federal law],' the laws of the adjacent states are 'the law[s] of the United States' on the OCS.") (citing 43 U.S.C. § 1333(a)(2)(A)).

## Recharacterization under Louisiana Law

ORRI Holders have argued that under Louisiana law, this Court is bound by unambiguous characterizations and statements of intent contained in a contract. (ECF No. 133 at 7). This rationale treats the parties' intent regarding the form and label of the transaction as equivalent to the parties' intent regarding the economic substance of the transaction.

In *Howard Trucking Co., Inc. v. Stassi*, the Louisiana Appellate Court affirmed the lower court's holding that, as a matter of law, the contracts entered into between the parties were "thinly disguised conditional sales," despite the fact that they were structured and characterized as leases. *Howard Trucking Co., Inc. v. Stassi* 474 So. 2d 955 (La. App. 5 Cir. 1985). The Louisiana Appellate Court noted that:

> It is well-established that we are not bound by the label placed on a written agreement or the subjective intent of the contracting parties, but must look to the substance of the transaction in determining rights and obligations. Words will have import and can be binding only when they describe relationships which actually exist, but not when they are merely labels which are used to alter or disguise actual relationships.

*Id.* at 960 (citing *Pastorek v. Lanier Sys. Co.*, 249 So.2d 224 (La. App. 4th Cir. 1971)).

In *Howard Trucking*, evidence was produced that both parties had the subjective intent to enter into a leasing arrangement. Furthermore, there were no terms in the agreement that could be deemed inconsistent with a lease. Nonetheless, the Appellate Court affirmed the trial court's decision to grant summary judgment and recharacterize the agreement as a conditional sale. The implication is that, notwithstanding Howard Trucking's arguments that the parties intended a lease, the economic substance of the transactions evidenced a different intent. Accordingly, this Court rejects NGP's contention that the Court is prohibited from looking beyond the four corners of the transaction when the stated intent as to the form and label of the contract is unambiguous. (Case No. 12-03433, ECF No. 101 at 17).

ATP argues that *Howard Trucking* requires the Court to characterize the transaction by answering "what's the *best* characterization" of the transaction, rather than answering "whether it *must* be characterized as something different than the parties' intent under Louisiana law." (ECF No. 152 at 17).   NGP, on the other hand, maintains that before this Court can engage in a recharacterization analysis, ATP must first show that there are terms in the transaction that are inconsistent with an ORRI under Louisiana law. (ECF No. 157 at 3).  This Court rejects NGP's argument that ATP is required to establish a threshold "inconsistency" with Louisiana law provisions concerning ORRIs. There was no threshold inconsistency in *Howard Trucking*. Indeed, in *Howard Trucking*, the parties entered into a transaction with terms that were wholly consistent with both a lease agreement and a credit sale of equipment.

In reaching its decision, the Court rejected Howard Trucking's argument that there was a material fact issue as to whether they intended the contract to be a sale or lease. In fact, the Court suggested that the parties' intent in making the contract was irrelevant to the recharacterization analysis:

> The affidavits submitted by the plaintiff merely allege that John Stassi wanted to call the contracts between the plaintiff and Orleans-Iberia leases for tax purposes and that Stassi supplied the printed lease forms which were signed by the parties. These facts were not contested by any party to the lawsuit and ***do not, in any event, bear upon the holding*** of the trial court.

*Howard Trucking Co., Inc. v. Stassi*, 474 So. 2d 955, 959 (La. Ct. App. 1985) writ granted, 478 So. 2d 1229 (La. 1985) and aff'd, 485 So. 2d 915 (La. 1986).

Accordingly, the Court held that evidence of the defendant's subjective intent to create a lease did not create a material fact issue because it was irrelevant to the Court's recharacterization analysis.  In other words, under Louisiana law, the parties' intent as to the legal effects of their contract has no bearing on whether those legal effects are in fact created.

**Applicability of Recharacterization under *Howard Trucking* to ORRI Transactions**

NGP contends that *Howard Trucking* is inapplicable to the case at hand. First, NGP argues that the intent of the parties should only be ignored, and the "economic substance" of a transaction determined, in rare instances such as (i) tax compliance cases and (ii) UCC true lease/financing cases. However, Louisiana Courts have recharacterized transactions as lease agreements outside the UCC true lease/financing context.   *See, e.g. Phoenix Assocs. Land Syndicate, Inc. v. E.H. Mitchell & Co., LLC*, 970 So.2d 605, 614 (La. App. 2007) ("The intent of Phoenix, Ellinger, and Pontchartrain cannot determine the character of the operating agreements because 'the legal character of a contract must be determined by *its substance*, by its effect on the parties, what the law—not the parties—says it is[.]'") (emphasis added) (*quoting Major v. Hall*, 251 So.2d 444, 448 (La. App. 1971) (holding contract was a sublease in violation of underlying lease notwithstanding Plaintiff's testimony that "he did not intend to sublet the service station," and holding that "the substance of this arrangement convinces us that there was a subletting of the station rather than an operating or management agreement") (emphasis added), *rev'd on other grounds*, 263 So. 2d 22, 24 (La. 1972) (reversing judgment as to damages only)); *Pastorek v. Lanier Sys. Co.*, 249 So.2d 224, 226 (La. App. 1971) (notwithstanding "lease contract, which described plaintiff [Pastorek] as 'lessee', Equilease as 'lessor', and Lanier as 'supplier' of the equipment," holding that contract was for sale of copier and that "Lanier sold the copier directly to Pastorek"; "While these parties have attempted to structure their relationships in particular ways, by designating roles through the use of legally charged language, we are bound to find the relationships as they exist and not simply as they have been described") (emphasis added).

The Fifth Circuit, applying Louisiana law, ignored the parties' label and subjective intent in ascertaining the true legal nature of ORRI transactions in other contexts.  In *Tidelands Royalty B Corp. v. Gulf Oil Corp.*, the Fifth Circuit held: "Under Louisiana law, the assignment of a lease with the retention of an overriding royalty creates a sublease, regardless of how the parties style their agreement." *Tidelands Royalty B Corp. v. Gulf Oil Corp.*, 804 F.2d 1344, 1349 (5th Cir. 1986).   The Court in *Tidelands* explained why looking beyond the label of a contract is especially important in the context of overriding royalty interests under Louisiana law. Unlike other jurisdictions, under Louisiana law the nature of rights that attend a royalty interest depend on the nature of the contractual relationship from which the royalty was created:

> In most other jurisdictions, the royalty owner is protected by the same or similar implied obligations regardless of the source of that royalty…In Louisiana, however, the nature of the rights that attend a royalty interest depend on nature of the contractual relationship from which the royalty was created. If the royalty is held by one who is not a lessor, the rules governing the lessor-lessee relationship do not apply. Moreover, the grant of royalty interest outside of the lease context usually creates a much lower degree of duty to the royalty owner…Therefore the distinction between royalties created by the lessee's reservation and those created by his grant is important in Louisiana.

*Tidelands Royalty B Corp. v. Gulf Oil Corp.*, 804 F.2d 1344, 1349 (5th Cir. 1986) (*internal citations omitted*).

### Recharacterization Standard

In addition to the argument that ATP must establish a "threshold inconsistency" with the definition of a Term ORRI under Louisiana law, NGP also argues that the Court cannot recharacterize the transaction as a loan unless it meets all of the requirements of a loan under Louisiana law. In other words, NGP argues that ATP must show inconsistency with a term ORRI *and* consistency with a loan under Louisiana law. However, at the summary judgment stage, ATP only needs to show that there is a genuine issue of material facts as to whether the

transaction is inconsistent with a term ORRI *or* that the transaction is consistent with a loan under Louisiana law.

Many of ATP's ORRI transactions, including the ATP-NGP one, appear to have some characteristics that resemble a debt instrument and others that resemble a real property conveyance. Each of the ORRI transactions must fall into one of four categories: (1) a transaction that is wholly consistent with both a debt instrument and a Term ORRI under Louisiana law; (2) one that is neither wholly consistent with an ORRI nor is it wholly consistent with a debt instrument; (3) one that is wholly consistent with a Term ORRI and has at least one inconsistency with a debt instrument; (4) one that is wholly consistent with a debt instrument and has at least one inconsistency with the definition of a Term ORRI under Louisiana law.

If NGP can establish that the NGP transaction is consistent with the meaning of a Term ORRI under Louisiana case law and that there is at least one inconsistency with the definition of a loan under Louisiana law, then partial summary judgment will be granted to NGP and ATP's recharacterization theory fails. This would necessarily show that the transaction is better characterized as a real property interest than as a debt instrument.

If, on the other hand, the transaction is wholly consistent with both a loan and a term ORRI, inconsistent with both, or inconsistent with a Term ORRI, then NGP's motion for summary judgment will be denied. Failure to show that the transaction is wholly consistent with a Term ORRI *and* that there is at least one inconsistency with a debt instrument under Louisiana law will require a fact intensive analysis beyond the summary judgment stage to determine the transaction's character.

**Nature of Term Overriding Royalty Interests**

The Louisiana Mineral Code does not define a "Term ORRI." Therefore, the Court is guided by generally accepted oil and gas law principles and Louisiana case law in determining whether a provision is inconsistent with a Term ORRI.

An overriding royalty is one type of non-cost bearing interest in an oil and gas leasehold estate. According to a leading oil and gas treatise, Williams and Meyers: "An overriding royalty is, first and foremost, a royalty interest. In other words, it is an interest in oil and gas produced at the surface, free of the expense of production."[5] A production payment is also a non-cost bearing interest in an oil and gas leasehold that "is a share of the oil produced from described premises, free of the costs of production at the surface, terminating when a given volume of production has been paid over or when a specified sum from the sale of such oil had been realized. … The generic term, production payment, includes interests in oil, gas, sulphur or other minerals…"[6]

Term Overriding Royalties are overriding royalties that terminate after payment of a specified sum, or upon the occurrence of certain conditions. Term Overriding Royalties are different from a "net profits interest" because they are measured by a fractional share of production, determined without regard to production costs, rather than based upon a percentage of "net profits" as determined after taking production costs into account.[7] Under Louisiana law, an overriding royalty is classified as a "real right" in "incorporeal immovable property."[8] A

---

[5] PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYER OIL AND GAS LAW § 418.1 at 352-53 (2012) (citation omitted).

[6] *Id*. at 366.10-366.12.

[7] *Id*. at § 424 at 438-39.

[8] *Duncan v. Paragon Res., Inc*., 417 So.2d 850, 854 (La. App. 3d Cir. 1982); *CLK Co. v. CXY Energy, Inc*., 719 So.2d 1098, 1101, 1104 (La. App. 4th Cir. 1998) (noting that mineral rights, including overriding royalties, are incorporeal immovables and holding that "[a] real right is a right that a person has in a thing, a matter of property law."). *See also* LA. REV. STAT. ANN. § 31:18 (West, Westlaw through 2012 Legis. Sess.).

royalty is a sum paid in a certain proportion to the production of oil or minerals after they have been produced and reduced to possession.[9]

**Inconsistencies with a Term ORRI under Louisiana Law**

There is a genuine issue of material facts as to whether the NGP-ATP transaction is consistent with a "Term ORRI" under Louisiana law.[10]   The Court will analyze each of the provisions that ATP alleges are inconsistent with a Term ORRI under Louisiana law.

*1.  Reversionary Nature/Transfer Not Absolute*

ATP argues that its reversionary interest in the Term ORRI is inconsistent with a true sale of real property. (Case No. 12-03443, ECF No. 110 at 19). Upon the full and final discharge of the Term ORRI, all "rights, titles, and interests… conveyed to [NGP] in the Subject Interests shall automatically terminate, revert to, and vest in [ATP]." *Id*.  However, NGP points out that in Louisiana, mineral rights are terminable.[11] (ECF No. 112 at 28).   In this case, the agreement provides for the Term Overriding Royalties to terminate in accordance with Louisiana Mineral Code section 31:85(4) by the "expiration of the time for which the royalty right was granted or happening of the dissolving condition attached to the mineral royalty." *See* LA. REV. STAT.

---

[9]LA. REV. STAT. ANN. § 31:213 (West, Westlaw through 2012 Legis. Sess.) (defining "royalty" as "any interest in production, or its value, from or attributable to land subject to a mineral lease, that is deliverable or payable to the lessor or others entitled to share therein. Such interests in production or its value are 'royalty,' whether created by the lease or by separate instrument, if they comprise a part of the negotiated agreement resulting in execution of the lease. 'Royalty' also includes sums payable to the lessor that are classified by the lease as constructive production.").

[10] ATP has not shown that any one provision, in isolation, that is inconsistent with a Term ORRI under Louisiana law.  However, the Court has not determined that a transaction that contains all of the terms in the NGP documents is consistent with the transfer of a real property interest under Louisiana law.

[11] *See, e.g.,* John M. McCollam, *A Primer for the Practice of Mineral Law Under the New Louisiana Mineral Code*, 50 TUL. L. REV. 732 (1976).  For example, with respect to mineral leases (and considering the dependent rights that may be carved therefrom such as overriding royalty interests), liberative prescription of nonuse is not applicable, but the lease must have a term. A mineral lease may not be granted for a primary term in excess of ten years without drilling or mining operations or production, and cannot be continued beyond such initial ten year term for a secondary period after drilling or production has ceased for a period of more than ten years. *See* LA. REV. STAT. ANN. § 31:115 (2012).

ANN. § 31:85(4) (2012). Louisiana Courts have implicitly recognized ORRI conveyances that revert to the grantor after the agreed condition is satisfied. *See, e.g.*, *Bailey v. Meadows*, 130 So. 2d 501, 503 (La. Ct. App. 1961) ("This sale and assignment contained a reversionary clause providing that an undivided one-eighth of seven-eighths interest in these three leases would 'automatically' revert to [grantor] after [grantee] had recovered from the oil, gas and minerals sold from the leased lands the sum of $2,400."). Thus, the reversionary nature of NGP transaction is consistent with a Term ORRI under Louisiana law.

### 2. *Satisfaction of the term override from multiple properties*

ATP argues that Section 1.3(d) is inconsistent with a Term ORRI under Louisiana law:

> Termination of Subject Interest. If any individual Subject Interest (or portion thereof, as applicable) should terminate before the discharge of the Term Overriding Royalty pursuant to this Section 1.3 and not be extended, renewed, or replaced, the Term Overriding Royalty shall no longer apply to that particular Subject Interest (or such portion thereof, as applicable), but the Term Overriding Royalty shall remain in full force and effect and undiminished as to all remaining Subject Interests (and the remainder portion of such Subject Interest, as applicable), and the determination of the occurrence of the Termination Time shall not be altered or affected in any way by reason of the termination of a Subject Interest (or the termination of a Subject Interest as to such portion thereof, as applicable).

(ECF No. 77-1 at 31).

Section 1.3(d) provides that if ATP were to have lost its rights in any one of the Subject OCS Leases, NGP's interests would remain in full force and effect as to the remaining OCS Leases. This means that if ATP lost one of its leases, NGP would still be entitled to the same stream of royalty payments until it reached its Total Sum, provided that there was sufficient production from the remaining releases. The Total Sum amount would just be satisfied from a reduced number of OCS Leases.

ATP has failed to cite to any Louisiana cases that have challenged the validity of an ORRI due its encumbering multiple leases. NGP has cited several cases where Louisiana Courts have implicitly recognized the ability to grant an overriding royalty interest in multiple properties.[12]  (Case No. 12-03443, ECF No. 128 at 11-12).  Accordingly, this provision has not been shown to be inconsistent with a Term ORRI under Louisiana law.

       *3.  Subordinated Interest to Diamond Offshore*

Provisions in the conveyance show that NGP agreed to subordinate its interests to the Diamond Offshore NPI, meaning that NGP would not be entitled to receive payments from any Hydrocarbon production from the applicable wells until Diamond's interest was fully satisfied and discharged.  ATP contends that a provision "whereby NGP agreed to subordinate purported "ownership" interests to Diamond Offshore's NPI—is entirely inconsistent with a true sale, despite the parties' intent."  (Case No. 12-03443, ECF No. 130 at 4-5). ATP fails to cite to any Louisiana statute or case law to support the claim that transferring a subordinated interest is inconsistent with a Term ORRI under Louisiana law.

NGP cites to *Stone v. Wright* in support of its proposition that the subordination provision is akin to a production payment's subordination to the recoupment of operating costs. (Case No. 12-03443, ECF No. 128 at 16) (citing *Stone v. Wright*, 75 F.2d 457, 459 (10th Cir. 1935), *cert. denied*, 295 U.S. 754 (1935) ("Provided, however, that the same shall not be paid and shall not be due until and after first party, or assigns, has been repaid out of the sale of oil produced from said well the actual cost of drilling and equipping said well into the tanks"). However, the

---

[12] *See, e.g., Continental Oil Co. v. Landry*, 41 So.2d 73 (La. 1949) (determining proper amount of royalty owed when single instrument used to create royalty in non-contiguous tracts and determining that royalty expired as to one tract for nonproduction, but interest retained in other tracks); *Freeman v. Block "T" Operating, LLC,* Case No. 13-58, 2013 WL 3442567 (La. App. Ct. July 10, 2013) (impliedly recognizing ability to grant overriding royalty in multiple wells located in different parishes); *Estate of Frankel vs. U.S.,* 512 F.2d 1007, 1008 (5th Cir. 1975) ("On August 1, 1960, Frankel and others conveyed certain oil and gas leases on Louisiana lands to the Berkshire Oil Company, retaining at the time of conveyance a production payment payable out of 70% of the oil production from the properties.").

"subordinating production payments to certain costs" analogy does not address the situation at hand, where the Term ORRI is subordinated to a completely independent third party's interests – not the grantor's operating costs.

The subordination provision appears to create a "conditional obligation" on ATP. The question is whether adding the condition that NGP will not be paid unless and until Diamond's NPI is paid in full is generally inconsistent with a real property interest under Louisiana law. Because there is no case law that addresses whether this subordination provision is consistent with a term ORRI, the Court will examine other recognized conditional obligations found in ORRI transactions.

The grantee of an overriding royalty interest is entitled to payment only if and when production is obtained. Thus, the nature of an overriding royalty interest under Louisiana law creates conditional obligations on the part of the grantor.

> We find that 'Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition' (Article 2021), and 'When an obligation has been contracted on condition that an event shall happen within a limited time, the condition is considered as broken, when the time has expired without the event having taken place. If there be no time fixed, the condition may always be performed, and it is not considered as broken, until it is become certain that the event will not happen.' Article 2038.

> In the instant case the obligation created in favor of plaintiffs, that is, to receive 1/16th of all of the oil, gas, or other minerals and 25¢ per ton on all salt and sulphur mined, *was conditioned upon the production of oil, gas, or other minerals*. True the contract did not designate a time within which the event must happen, nevertheless that time is limited by law and 'the condition is considered as broken, when the time [10 years] has expired without the event having taken place.' (Brackets ours.)

*Vincent v. Bullock*, 192 La. 1, 22-23, 187 So. 35, 42 (1939); *See also Humble Oil & Refining Co. v. Guillory*, 212 La. 646 (1946); *Continental Oil Co. v. Landry*, 215 La. 518 (1949); *Union Sulphur Co. v. Andrau*, 217 La. 662, 670, 47 So. 2d 38, 40 (1950) ("[T]he right of the owner of

such an interest 'is restricted to a sharing in production if and when it is obtained by the landowner or a lessee.").

However, NGP's royalty payments were not only conditioned on the production of oil, but also subject to the condition that NGP would not begin receiving royalty payments until the full satisfaction and discharge of Diamond's NPI.  Although no Louisiana Court has addressed this exact subordination provision, Courts have recognized other conditions placed on royalty payments. For example, in *Bond v. Midstates Oil Corp.*, a Louisiana Court implicitly held that a provision where royalty payments were conditioned on obtaining future leases was consistent with an overriding royalty interest under Louisiana law. *Bond v. Midstates Oil Corp.*, 219 La. 415, 53 So.2d 149, 154 (1951) ("We are of the opinion that the payment of the 1/32 overriding royalty to Smitherman so long as the lease remains in force is in the nature of rent, under the jurisprudence of this State, and the fact that it may continue to be paid under any future leases would not change its nature."). The Louisiana Supreme Court did hold that a provision to pay royalty payments if a new lease was contracted for within one year after the termination of the existing lease to be a personal obligation. *Berman v. Brown*, 224 La. 619, 657-58, 70 So. 2d 433, 446-47 (1953).  However, this personal obligation did not change the nature of the overriding royalty interest. The court simply treated the provision as a personal obligation mixed into an overriding royalty conveyance.

In *Waller v. Midstates Oil Corp.*, the Court recognized the provision that "the overriding royalty, herein provided, comes into existence as to a particular drilling unit, selected in the manner herein provided, only after the oil payment chargeable to that particular unit has been

satisfied, and provided that oil is being produced by natural flow, *i.e.*, without being pumped or produced by other artificial means."[13]

In any event, NGP has not cited to any case that either explicitly or implicitly recognizes a "subordinated interest" provision. Accordingly, the Court finds that there is a genuine issue of material fact as to whether this provision is consistent with a Term ORRI under Louisiana law.

### 4.  Burdens and Benefits of Ownership

Finally, ATP argues that its retention of the general burdens and benefits of ownership is inconsistent with NGP owning a real property interest under Louisiana law. (Case No. 12-03443, ECF No. 110 at 18-19).  ATP points out that it maintains exclusive control and operation of the relevant wells and leases, that the Term ORRI is free of all BOEM Royalties, Net Profits Interests, and Direct Taxes, and that ATP has the unfettered right to conduct any operations, or to release, surrender, or abandon the Subject Interests encumbered by the Term ORRI. *Id*.

However, ATP is conflating its own rights as lessee with NGP's overriding royalty interest. An overriding royalty interest under Louisiana law is defined as a passive interest.  The royalty owner has no right to develop or operate the property.[14] In fact, if NGP had a right to participate in operations this would be inconsistent with an overriding royalty interest under Louisiana law.  Moreover, in order to be considered an overriding royalty under Louisiana law, the royalty owner *must hold its interest free of the expense of production*. Consistent with this Louisiana requirement, the parties agreed that "all operations on the OCS Leases, and the extent

---

[13] *Waller v. Midstates Oil Corp.*, 218 La. 179, 185-86, 48 So. 2d 648, 650 (1950).

[14] *See Tidelands Royalty "B" Corp. v. Gulf Oil Corp*., 804 F.2d 1344, 1349-50 (5th Cir. 1986) ("The distinguishing characteristic of a nonexecutive royalty interest is its 'passive' nature. The royalty owner has no right to explore, develop, or lease the subject tract. Moreover, the landowner has no obligation to develop or lease the premises for the benefit of the royalty owner."); s*ee also Continental Oil Co. v. Landry*, 41 So.2d 73, 75 (La. 1949) ("It is also well settled that this [mineral royalty] right is merely one to share in the production of oil, gas, and other minerals if and when they are produced from the property subject to the right. It is passive in its nature, and there is no obligation on the royalty owner to develop the property, nor does he have this right. All that he acquires is a right attached to the land, the right to receive his share of the minerals if and when they are produced.").

and duration thereof, shall be within the reasonable discretion of [ATP]."  (ECF No. 112 at 29).
ATP's retention of operational control and expenses related to the leases is consistent with the
definition of a Term ORRI under Louisiana law.  Accordingly, ATP's retention of exclusive
control and operation of the wells is consistent with a Term ORRI under Louisiana law.

   *5.  Payment Terms*

   ATP also argues that the payment terms of the NGP transaction are inconsistent with a
Term ORRI under Louisiana law. (ECF No. 105 at 11-12). The Court finds that there is a
genuine issue of material fact as to whether the Payment Terms of the NGP transaction are
consistent with a Term ORRI under Louisiana law.

   The initial conveyance provides that NGP receives overriding royalty payments equal to
the applicable percentage interest in the proceeds from the oil and gas produced from the subject
leases until such time as NGP receives the "Total Sum" owed.  The "Total Sum" is defined as an
amount equal to the Primary Sum plus accrued interest on the un-liquidated balance of the
Primary Sum at a stated Notional Rate of 12.35% per annum plus certain costs paid by NGP.
(ECF No. 77-1 at 91).  NGP's royalty payments are calculated as a percentage of Gross Proceeds
minus Transportation Costs, rather than a fixed amount. *Id*.  These Royalty Payments are made
to NGP on certain due dates under the Relevant Transactions if and when hydrocarbons are
produced. *Id*. If ATP is late in making the overriding royalty payments, NGP charges ATP a
default rate of interest of 7.5% per annum on the unpaid amount when due until such amount is
paid. *Id*. at 92.

   The additional two conveyances did not change the nature of the payment terms. The
second conveyance increased NGP's Primary Sum amount by $15,000,000.00, increased the
Notional Rate from 12.35% to 13.2% per annum, and increased the default rate from 7.5% to

14.5%.  The third conveyance increased NGP's Primary Sum by an additional $25,000,000.00 and the Term ORRI attached to three additional OCS Leases different from those in the initial conveyance.

Section 3.4 in each of the conveyances stipulates how the overriding royalty payments are to be applied to the "Total Sum." The Royalty Payments are first applied to "interest and other costs," and then the remainder of the payment, if any, is applied against the outstanding balance the Primary Sum. *Id.*  To the extent the overriding royalty payment is not sufficient to pay the accrued interest, that interest is added to the unliquidated balance of the Primary Sum. *Id.*

Finally, the conveyance provides that "Grantee [NGP] shall look solely to the Royalty Payments for satisfaction and discharge of the Term Overriding Royalty, and Grantor [ATP] shall not be personally liable for the payment and discharge of the Term Overriding Royalty other than for the delivery and payment of Royalty Payments, if any, that accrue and become due and owing to Grantee under this Conveyance." *Id.* at 77.

The Term Overriding Royalties do not bear the expenses of production. NGP is not required to fund any of the costs of production, a factor courts have relied on in identifying particular interests as overriding royalties or production payments.[15] While third-party pipeline Transportation Costs are deducted from each Royalty Payment owed to NGP, these are *post*production costs[16] rather than costs of getting the oil and gas to the surface. It is common for

---

[15] *See e.g.*, *Cities Serv. Oil Co. v. Pubco Petroleum Corp.*, 497 P.2d 1368, 1372 (Wyo. 1972) ("The term 'overriding royalty' has been defined in numerous judicial opinions as an interest in oil and gas production at the surface, free of the expense of production … ."); *Alamo Nat'l Bank of San Antonio v. Hurd*, 485 S.W.2d 335, 339-40 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) ("An overriding royalty is first and foremost a royalty interest. In other words, it is an interest in oil and gas produced at the surface, free of the expenses of production…  An oil payment is a share of the oil produced from the described premises, free of costs of production… .").

[16] Section 2.1 of the Original Conveyance defines "Transportation Costs" as "… all costs and expenses relating to post-production activities and services downstream of the Downstream Interconnects that are paid by Grantor to any Downstream Pipeline …."

royalties and overriding royalties to share pro-rata in *post*-production costs,[17] as covenants to transfer the interests free from costs of production necessarily imply the interests are not free of costs post-production.

ATP argues that its conditional obligation to make royalty payments is inconsistent with NGP's real property ownership. Under the terms of the NGP transaction, if there is no production, then ATP has no obligation to repay any portion of the purchase price paid by NGP for the overriding royalty interests.[18]   However, conditional payment terms establishing *if and when* production proceeds must be distributed are commonplace in the conveyance of royalty interests. *See, e.g., Frey v. Amoco Prod. Co.*, 603 So. 2d 166, 178 (La. 1992) (holding that obligation to pay royalty is triggered by sale or production of oil or gas).

ATP also argues that the provision of the conveyance which explicitly sets NGP's Notional Rate of return is inconsistent with real property ownership. (ECF No. 85 at 19).

> If the Term ORRI was an ownership interest in the minerals, which it is not, NGP's rate of return would be variable dependent on oil and gas prices, production volumes and the life of the OCS Leases. NGP's rate of return, although not guaranteed, is explicitly set by the terms of the Conveyance.

*Id*.

As discussed at the July 11 hearing, NGP paid a total amount of $65 million in exchange for an overriding royalty, which would terminate when the agreed upon "Primary Sum" and

---

[17] *See, e.g., Martin v. Glass*, 571 F. Supp. 1406, 1414, 1416 (N.D. Tex. 1983), *aff'd*, 736 F.2d 1524 (5th Cir. 1984)("it appears that Texas and Louisiana law are the same; both jurisdictions allow the deduction of post-production cost when royalty is determined 'at the mouth of the well'… An overriding royalty is, first and foremost, a royalty interest… As such, an overriding interest is subject to expenses incurred subsequent to production."); *Wall v. United Gas Pub. Serv. Co.,* 152 So. 561, 563-64 (La. 1934) (unless otherwise agreed to, royalty holder entitled to "market price" at the well thus transportation costs and post-production, processing costs are properly deducted); *Freeland v. Sun Oil Co.*, 277 F.2d 154, 159 (5th Cir. 1960) ("The royalty owner shares only in what is left over… In this sense he bears his proportionate party [sic] of that cost, but not because the obligation (or expense) of production rests on him. Rather, it is because that is the way in which Louisiana law arrives at the value of the gas at the moment it seeks to escape from the wellhead.").

[18] ATP admits that NGP's rate of return on its purchase price is not guaranteed. "NGP's rate of return, ***although not guaranteed***, is explicitly set by the terms of the Conveyance." (ECF No. 85 at 19).

"Notional Interest Rate" was paid to NGP as defined in section 3.3 of the Conveyance.[19] As part of the formula to calculate the Total Sum, NGP would receive a specified return on its investment. The question is whether the calculation of an overriding royalty interest using a formula that provides for a specified return on investment is consistent with a Term ORRI under Louisiana law.

The Louisiana Mineral Code allows for termination of mineral royalty interests upon the "expiration of the time for which the royalty right was granted or happening of the dissolving condition attached to the mineral royalty."[20]  NGP argues that because there are no statutory limitations on how parties can define the "dissolving condition attached," contracting parties are free to define the "dissolving condition" of the Term ORRI however it pleases.[21]  However, NGP has not provided the Court with any Louisiana case law to support this argument.

The Court rejects NGP's contention that parties may define the "dissolving condition" in any way they please, but nevertheless retain the transaction's characterization as a Term ORRI. If this were true, then the parties could define a "dissolving condition" that was wholly inconsistent with a Term ORRI, without losing its characterization as an ORRI.

The Innes Report discusses how this payment structure appears inconsistent with property ownership:

> Variations in the production and prices achieved from the sale of the oil and gas produced from the subject OCS Leases would have an effect on the total return realized by NGP in that the greater the production and selling price of the oil and gas from specified OCS Leases, the faster the repayment to NGP of the Primary Sum plus interest and this less interest income realized by NGP. Conversely,

---

[19] *See* ECF No. 77-1 at 45.

[20] *See* LA. REV. STAT. ANN. § 31:85(4).

[21] "The parties were free to agree to any reasonable calculation to define NGP's proportionate share of production, as well as the mechanism for defining the term (i.e., time, quantity, or value realized) to determine the termination of the interest." (ECF No. 112 at 27).

24 / 32

lower production or commodity prices would result in slower repayment and
greater interest income to NGP.

(ECF No. 111-1 at 108).

The "dissolving condition" of the Term ORRI caps NGP's return to a fixed annual rate of
interest.  Innes points out that fluctuations in oil and gas revenues on the properties have only a
trifling impact on NGP's rate of return. *Id*.  Moreover, "For the NGP Term ORRI, increased
revenues result in faster repayment and thus lower interest income accrued during the term of the
ORRI." *Id*.  The fact that increased revenue from the properties leads to a decrease in NGP's
income appears to be at odds with real property ownership.

In sum, there are two provisions that may be inconsistent with a Term ORRI: (1) the
"subordinated interest" provision; (2) the interest rate based formula used to define the ORRI's
terminating condition.  Accordingly, the Court finds that there is a genuine issue of material facts
as to whether the NGP transaction is consistent with a Term ORRI under Louisiana law.

### Inconsistencies with a Loan under Louisiana Law

There is a genuine issue of material fact as to whether the NGP conveyance is consistent
with the definition of a loan under Louisiana law.

*1.  Secured Loan*

The NGP transaction does not meet the threshold requirements of a mortgage under
Louisiana law. The Louisiana Civil Code defines "mortgage' by the right of the oblige to "cause
the property to be seized and sold in a manner provided by law and to have the proceeds applied
toward the satisfaction of the obligation in preference to claims of others" on "failure of the

obligor to perform."[22] ATP acknowledges that NGP has no right under the agreement to foreclose on any of the Subject Properties.[23]

In *In re Senior-G & A Operating Co.,* the Fifth Circuit recharacterized the conveyance of an overriding royalty interest as a security interest and not a conveyance of a real property interest because the party receiving the purported royalty interest retained a right to foreclose on and operate the well if it did not produce.[24]  Because the ability to foreclose and operate the well is inconsistent with the passive nature of an overriding royalty interest and consistent with the terms of a secured loan, the bankruptcy court found, and the Fifth Circuit affirmed, that the conveyance was inconsistent with a royalty interest. *Id.* Unlike *In re Senior-G & A*, the Conveyance in this case did not grant NGP a right to foreclose and operate the well if it did not produce.

Although NGP did not have a foreclosure remedy, the Court inquired about other ways that NGP may have been able to exercise control over the Subject Properties. At the July 11, 2013 hearing, the Court asked about NGP's rights and remedies under Louisiana law if ATP failed to act as a "prudent operator." (ECF No. 123 at 39). Specifically, the Court inquired about whether NGP "could have gotten a receiver appointed to then operate the properties as a prudent operator" in the event that ATP breached its duty to do so. (ECF No. 123 at 51-52).

Louisiana Civil Code article 2710 "imposes on a lessee the obligation to enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease."[25]

---

[22] La. Civ. Code Ann. art. 3278-79 (2012), article 3278 made applicable to mineral transactions by La. Rev. Stat. Ann. § 31:203 (2012).

[23] ECF No. 123 at 64 ("I agree, they do not have a foreclosure remedy.").

[24] *In re Senior-G & A Operating Co.* 957 F.2d 1290, 1296 (5th Cir. 1992).

[25] *Williams v. Humble Oil & Ref. Co.*, 432 F.2d 165, 176 (5th Cir. 1970).

Although there is no statutory duty owing from a lessee to the grantee of overriding royalty interests, clauses imposing duties on lessees to protect overriding royalty owners are consistent with Louisiana mineral law.[26]

ATP contractually agreed to "operate and maintain the OCS Leases as would a prudent operator and in material accordance with all Laws and applicable contracts and agreements, with all decisions with regard to the conduct of operations to be made without considering the effect of the Term Overriding Royalty…" (ECF No. 77-2 at 17).   However, this provision did not appear to expand ATP's duties because the OCSLA already requires prudent operation.[27]

NGP is limited by contract to money damages for breach of any covenant or obligations.[28] It appears that before seeking the appointment of a receiver under Louisiana law, two things need to happen: (1) NGP would have to obtain a judgment in money damages; (2) ATP would need to not pay that judgment.[29] Under these circumstances, a Louisiana court may agree to appoint a receiver, but NGP would have no control over whether to sell the properties, to continue production thereon, or to shut-in the properties that the receiver is permitted to control. Moreover, NGP would have no certainty that the property would be available to satisfy

---

[26] *See, e.g., Frankel v. Exxon Mobil Corp.*, 923 So.2d 55, 77 (La. Ct. App. 2005); (upholding clause requiring assignment of lease to ORRI owner in the event of expected lease termination within 60 days).

[27] "OCSLA" provides certain requirements of any lessee. *See, e.g.,* 30 CFR 250.1150 ([lessee] "must produce wells and reservoirs at rates that provide for economic development while maximizing ultimate recovery and without adversely affecting correlative rights.") 30 CFR 550, subpart N and 30 CFR 250, subpart N further provide that various civil and criminal penalties (monetary and otherwise) may be assessed for failure to do so.

[28] "provided, however, that the foregoing shall not relieve Grantor of the obligation to perform, ***and to respond in damages for any breach*** by Grantor of, its representations, warranties, covenants, agreements, and obligations under this Agreement or the Purchase and Sale Agreement, and to perform its obligations under each indemnity under this Agreement or the Purchase and Sale Agreement." *See* ECF No. 77-2 at 32.

[29] *See* LA. REV. STAT. ANN. § 12:317 (2012) ("The court may appoint a receiver to take charge of a foreign corporation's property in this state on any ground set forth in [Louisiana Revised Statute section] 12:151; LA. REV. STAT. ANN. § 12:151 (2012) ("The court may, after trial, appoint a receiver to take charge of the corporation's property when it is made to appear, in a proceeding instituted against the corporation: … (3) By any creditor, that the corporation is insolvent, or such creditor's claim has been reduced to judgment, on which execution has been issued and returned "nulla bona").

its judgment in preference to the claims of others.  Thus, NGP's rights to seek appointment of a receiver is not akin to the right to "cause the property to be seized and sold in a manner provided by law and to have the proceeds applied toward the satisfaction of the obligation in preference to claims of others."[30]  Accordingly, the lack of a foreclosure remedy makes the NGP transaction inconsistent with the definition of a "mortgage" under Louisiana law.

### 2.  *Unsecured Loan*

ATP is left with the theory that the NGP transaction is an unsecured loan.  Under Louisiana law, a loan of money is a contract by which one person pays money to another, and the party receiving the funds "is bound to repay the same numerical amount … regardless of fluctuation in the value of the currency." LA. CIV. CODE ANN. ART. 2907.  The definition of a loan provides for the unconditional obligation to repay the money loaned.  ATP is expressly not obligated to repay any amount of money to NGP.  The conveyance provides that NGP:

> Shall look solely to the Royalty Payments for satisfaction and discharge of the Term Overriding Royalty, and Grantor [ATP] shall not be personally liable for the payment and discharge of the Term Overriding Royalty other than for the delivery and payment of Royalty Payments, if any, that accrue and become due and owing to Grantee under this Conveyance…

Original Conveyance at 1.4, App. 76.

NGP argues that its overriding royalty interest does not create a debt because ATP's obligation to make payments is entirely contingent on the production of oil.  ATP admits that NGP's rate of return on its purchase price is not contractually guaranteed. "NGP's rate of return, ***although not guaranteed***, is explicitly set by the terms of the Conveyance." (ECF No. 85 at 19).  However, if the risk of non-payment was so low that ATP effectively guaranteed repayment of the purchase price and the agreed upon rate return, then the "condition" (that NGP would receive

---

[30] LA. CIV. CODE ANN. art. 3278-79 (2012), article 3278 made applicable to mineral transactions by LA. REV. STAT. ANN. § 31:203 (2012).

royalty payments *only if and when* production occurred) is an artificial one. An ORRI that is virtually certain to be satisfied in full from production is the economic equivalent of an "obligation to repay."

In *Howard Trucking*, the Court recharacterized a lease as a credit sale, notwithstanding the fact that the debtor was not contractually obligated to pay the $100.00 option price to buy the equipment at the end of the lease.[31] Even though lessee was not contractually obligated to pay $100.00 at the end of the lease, it was virtually certain that the lessee would make the "option payment" in order to acquire title in the equipment.

The Court finds that there is a genuine issue of material facts as to whether the NGP transaction is consistent with the economic substance of a debt instrument under Louisiana law.

### Evaluating the Economic Substance of a Loan under Accounting Principles

It appears that the NGP transaction is properly characterized as a loan under general accounting principles. GAAP states, in relevant part:

> Funds advanced to an operator that are repayable in cash out of proceeds from a specified share of future production of a producing property, until the amount advanced plus interest at a specified or determinable rate is paid in full, shall be accounted for as a borrowing. The advance is a payable for the recipient of the cash and a receivable for the party making the advances.

(ECF No. 111-1 at 103).

A treatise generally recognized as authoritative in the accounting field states that a conveyance will be considered a loan if:

> The seller retains substantially all pricing and production risk.  The contractual interest is expressed in dollar terms, and either: (1) ***the underlying expected cash***

---

[31]"The so called lease payments are clearly installments and the $100.00 option to purchase this very valuable equipment does not obscure the fact that this is a conditional sale agreement." *Howard Trucking Co., Inc. v. Stassi*, 485 So. 2d 915, 919 (La. 1986).  Although the Court refers to this as a "conditional sale," the Court implicitly ruled that the parties had a creditor-debtor relationship by determining that that Howard Trucking violated the Deficiency Judgment Act, which states: "This Section is limited to judicial sales of mortgaged property."  *See* La. Rev. Stat. Ann. § 13:4106.

*flow for repayment is significantly greater than the contractual obligation*, or (2) the amount of the obligation is guaranteed by the seller. In substance, the owner is not selling the property but is instead borrowing funds.

(*Id*).

For the NGP transaction, there is evidence that supports the argument that "the underlying expected cash flow for repayment was significantly greater than the contractual obligation" owed to NGP.  The Innes Report outlines ATP and NGP documents that analyze the risk of non-payment and projected timetables for full repayment. (ECF No. 111-1).

ATP indicated that the principal and interest ("Total Sum") owed to NGP would be repaid by July 2013, approximately one year after NGP's last advance to ATP. (*Id*. at 110). ATP stated in its SEC filing 10K that for the year ending December 31, 2011, that it expected approximately 93% of its term ORRIs (including the NGP Term ORRI) to be repaid over the following 12 months. (*Id*. at 110-111).

NGP also acknowledged that the risk of nonpayment was quite low.  In each "Investment Update," NGP summarized its analysis regarding the NGP Term ORRI by stating "we believe there is little risk of loss of capital and that our yield is appropriate." (*Id*. at 111). In NGP's November 15, 2011 Form 10G, it described the Term ORRI as follows:

In September 2011, ATP Oil & Gas Corporation, or ATP, fully repaid the remaining outstanding balance on our second limited term royalty interest agreement with ATP, including a $0.7 million "make-whole" payment to satisfy the ***guaranteed 16% return*** in the agreement.

(ECF No. 85 at 21).

The fact that NGP regarded the Term ORRI as a "guaranteed 16% return" suggests that the "condition" that NGP would receive royalty payments *only if and when* production occurred may have been an artificial condition.

### The Fifth Circuit's Economic Substance Approach

In the context of valuing a production payment for estate tax purposes, the Fifth Circuit has evaluated an ORRI transaction (similar to the NGP one) to determine whether it was consistent with the economic substance of a loan.  In *Frankel v. U.S.*, the issue was whether the decedent's production payment should be valued at its full unrecouped face amount or reduced by a discount rate of 6% per annum to reflect the risks involved in owning such investments.[32] The decedent, Frankel, conveyed certain Louisiana oil and gas leases and retained an ORRI payable out of 70% of oil production from various properties, set to terminate once Frankel was repaid the face value of $8,000,000.00, plus a 6% annual interest rate.[33]

The district court rejected the estate's contention that a 6% discount rate reduction was appropriate by finding that the production payment was economically equivalent to a note.  The Fifth Circuit reversed, finding that the note analogy was improper because the 6% interest rate on the $8,000,000.00 face value did not accurately reflect the risk of nonpayment because when Frankel retained the production payment, he assumed no new risks that he had not borne as owner of the leasehold interest.[34] The Court seemed to be rejecting the note analogy because of how Franklin acquired the production payment.[35] Frankel conveyed certain oil and gas leases while retaining a production payment from the properties. The estate expert testified that Frankel's retention of the interest was a part of a package deal where Frankel could have accepted a lower interest rate in exchange for receiving a higher purchase price for the

---

[32] The sole matter in dispute was the fair market value of the decedent's production payment for estate tax valuation purposes. *See Frankel's Estate v. U. S.*, 512 F.2d 1007, 1008-09 (5th Cir. 1975).

[33] *Id*. at 1008.

[34] *Id*. at 1011. ("The assumption that the rate of interest carried by a note contains an allowance for risk is itself based on the assumption that, by accepting the note, the lender is assuming risks that he previously did not bear. It is at this point that the note analogy between a production payment and a note breaks down.").

[35] Moreover, the estate's expert testified that any third party buying a production payment would have expected a 15% return on it.

conveyance. The expert differentiated Frankel's retention of an interest from an outside buyer's interest: "The risk would come into a prospective buyer of this production payment who has no other deal involved in this thing other than to buy the production payment."[36]  The implication is that when a third party purchases an ORRI transaction structured like the one in *Frankel*, it is the economic equivalent of a note.  In this case, NGP was a third party purchaser.

Both parties treated the NGP transaction like a loan and NGP represented it as one to the public.  The transaction appears to fall within the meaning of a loan under several accounting standards, including GAAP.  The parties agreed to treat the transaction as a mortgage loan for federal tax purposes. There is evidence to support the "economic argument" that the risk of nonpayment of the "Total Sum" was so low that ATP *effectively* had an unconditional obligation to repay. The Court in *Howard Trucking* recharacterized a lease as a credit sale despite the fact that Howard Trucking had no contractual obligation to pay the $100.00 option price at the end of the lease. Finally, the Fifth Circuit's rationale from *Frankel* suggests that the NGP transaction is the economic equivalent of a loan.  Accordingly, there is a genuine issue of material fact as to whether the NGP transaction is consistent with a debt instrument under Louisiana law.

### Conclusion

An Order will be entered consistent with this Memorandum of Law.

SIGNED **January 6, 2014.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[36] *Id*. at 1011.