IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ATP OIL & GAS CORPORATION | § | Case No. 12-36187 |
| | § | Chapter 11 |
| | § | |
| DEBTOR. | § | |
| OHA INVESTMENT CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | Adversary No. 12-03443 |
| | § | |
| ATP OIL & GAS CORPORATION AND, | § | |
| BENNU OIL & GAS, LLC | § | |
| | § | |
| Defendants. | § | |

**JOINT RESPONSE OF STATUTORY LIENHOLDER INTERVENORS
TO OHA INVESTMENT CORPORATION'S MOTION TO DISMISS M&M
INTERVENOR COMPLAINTS PURSUANT TO FED R. CIV. P. 12(b)(6)**
[Relates to Docket No. 284]

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Schlumberger Technology Corporation, Wireline Control Services, LLC, Supreme Service & Specialty Co. Inc., Smith International, Inc., M-I L.L.C. d/b/a M-I SWACO, Canrig Drilling Technology, Ltd., Champion Technologies, Inc., Offshore Energy Services, Inc., Workstrings International, L.L.C. Fastorq, LLC, Superior Energy Services, L.L.C. d/b/a Superior Completion Services, Stabil Drill Specialties, L.L.C., Warrior Energy Services Corporation, Harvey Gulf International Marine, LLC, Expeditors and Production Services, Inc., EPS Cargo Handlers Company, Inc. and Hornbeck Offshore Services, LLC (collectively, "M&M Intervenors") file this Joint Response to OHA Investment Corporation's ("Plaintiff" or "OHA") Second Amended Motion to Dismiss M&M Intervenor Complaints Pursuant to Fed. R. Civ. P. 12(b)(6) ("Second Amended Motion to Dismiss") (Docket No. 284) and would show the Court as follows:

1

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

2.     OHA purchased its respective term overriding royalty interests ("ORRIs") out of ATP's working interest, or operating interest[1], in the Telemark and Gomez Properties.  Prior to ATP's assignment of ORRIs to OHA, the M&M Intervenors privileges were established over ATP's entire working interest as it existed on the applicable lien inception date and effective against any third person.  OHA's Second Amended Motion to Dismiss is premised on the incorrect argument that under applicable Louisiana law, Plaintiff purchased its respective ORRIs free and clear of the M&M Intervenors' respective statutory privileges that already encumbered ATP's operating interest. However, prior to ATP's assignment of ORRIs to OHA, the M&M Intervenors' privileges were established over ATP's entire operating interest and effective against any third person including OHA.  Accordingly, after the establishment of the M&M Intervenors' privileges, ATP could not transfer any derivative interests out of its operating interest free and clear of the M&M Intervenors' privileges, and therefore, the subsequently conveyed ORRIs remain subject to the M&M Intervenors' privileges under applicable Louisiana law.

---

[1] An "operating interest" is a type of working interest.  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 390 n.1 (5th Cir. 2006), citing Black's Law Dictionary, (8th ed. 2004); *see also Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.,*  63 So. 3d 159, 170 (La. App. 2d  Cir. 2011) (characterizing an operating interest as a type of working interest, for example, "[t]his was a transfer therefore of an operating or working interest as opposed to those non-operating interests . . ."); *Kimbell v. United States*, 371 F.3d 257, 267 (5th Cir. 2004)("A working interest in an oil and gas lease is a cost-bearing operating interest in the property"); *Bonn Operating Co. v. Devon Energy Prod. Co.,*  613 F.3d 532, 533 (5th Cir. 2010) (holders of operating and non-operating interests both have working interests); *Online Resources, Inc. v. Stone Energy Corp.* No. 99-2006, 1999 U.S. Dist. LEXIS 17057 (E.D. La. Oct. 29, 1999) ("An oil and gas lease is an instrument by which a working interest or operating interest is created").  *See also* Patricia H. Chicoine, Lien on LOWLA; It's a Privilege: Recent Revisions to the Louisiana Oil Well Lien Act, 57 La. L. Rev. 1133, 1139 (1997) (discussing statutory definition of "operating interest" under the 1995 amendment to the Louisiana Oil Well Lien Act).

## FACTUAL BACKGROUND

3.     Prior to the filing of ATP's voluntary petition for relief under the Bankruptcy Code, the M&M Intervenors furnished certain materials, equipment, labor and/or services to ATP in connection with the drilling, development, exploration and operation of the below described oil and gas wells located within federal oil and gas lease blocks within the Outer Continental Shelf— Gulf of Mexico, adjacent to the State of Louisiana, known as the Telemark Properties and Gomez Property:

| Lease | Block | Wells |
|-------|-------|-------|
| OCSG-16661 | Mississippi Canyon 941 ("MC 941") | MC 941 A-1 and MC 941 A-2 (a/k/a MC 941 #4 well), and another other wells located in whole or in part within Block MC 941 |
| OCSG-24130 | Mississippi Canyon 942 ("MC 942") | MC942 #2, A #2, and A#3 wells, and any other wells located in whole or in part within Block MC 942 |
| OCSG-14016 | Mississippi Canyon 711 ("MC 711") | MC 711 #5 and any other wells located in whole or in part within Block MC 711 |
| OCSG-13198 | Atwater Valley 63 ("AT 63") | AT 63 and any other wells located in whole or in part within Block AT 63 |

(collectively, the "Subject Properties").  ATP failed to pay the M&M Intervenors for furnishing their respective materials, equipment, labor and/or services for operations conducted on the Subject Properties, and the M&M Intervenors hold valid and perfected statutory liens and privileges under applicable federal and state law that attached to ATP's interests in the Subject Properties at time M&M Intervenors commenced their work, which are summarized below and detailed in the M&M Intervenors' respective complaints in intervention and exhibits thereto (collectively, the "Subject Privileges").

4.     Schlumberger Technology Corporation began furnishing materials, equipment, labor and/or services to the Subject Properties not later than January 24, 2011 and provided services to ATP until July 25, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties. Schlumberger Technology

Corporation filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim in the principal amount of <u>$12,136,680</u> on August 20, 2012, with an amendment filed on September 6, 2012, which was within 180 days of the last date of service for the Subject Properties.   A true and correct copy of the recorded Schlumberger Technology Corporation Amended Lien Affidavit is attached as **<u>Exhibit 1</u>**, without exhibits.

5.     Wireline Control Services, LLC began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 10, 2012 and provided services to ATP until May 22, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Wireline Control Services, LLC filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim in the principal amount of <u>$85,855</u> on August 23, 2012, with an amendment filed on September 6, 2012, which was within 180 days of the last date of service for the Subject Properties.  A true and correct copy of the recorded Wireline Control Services, LLC Amended Lien Affidavit is attached as **<u>Exhibit 2</u>**, without exhibits.

6.     Supreme Service & Specialty Co. Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than January 1, 2010 and provided services to ATP until October 26, 2012 and thereafter, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Supreme Service & Specialty Co. Inc. filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim and Statement of Privilege in the principal amount of <u>$909,024</u> on August 14, 2012, with an amendment filed on November 15, 2012, which was within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded Supreme Service & Specialty Co. Inc. amended lien affidavit is attached as **<u>Exhibit 3</u>**, without the voluminous exhibits, which are available upon request.

7.     Smith International, Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 10, 2012 and provided services to ATP until June 2, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Smith International, Inc. filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim and Statement of Privilege in the principal amount of $1,012,865 on August 20, 2012, with an amendment filed on September 6, 2012, which was within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded Smith International, Inc. Amended Lien Affidavit is attached as **Exhibit 4-A**, without exhibits. Smith International, Inc. filed a second Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim and Statement of Privilege in the principal amount of $7,500 on November 2, 2012, related to materials, equipment, labor and/or services furnished to the Subject Properties on May 30, 2012.  This second Lien Affidavit was also filed within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded Smith International, Inc. Lien Affidavit, recorded on November 2, 2012 is attached as **Exhibit 4-B**, without exhibits.

8.     M-I L.L.C. d/b/a M-I SWACO began furnishing materials, equipment, labor and/or services to the Subject Properties not later than July 12, 2011 and provided services to ATP until August 2, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties. M-I L.L.C. d/b/a M-I SWACO filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim in the principal amount of $3,190,264 on August 20, 2012, with an amendment filed on August 27, 2012, which was within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded M-I L.L.C. d/b/a M-I SWACO Amended Lien Affidavit is attached as **Exhibit 5**, without exhibits.

9.      Canrig Drilling Technology, Ltd. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 3, 2012 and provided services to ATP until July 2, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties. Canrig Drilling Technology, Ltd. filed its Affidavit and Sworn Statement in Support of Lien on Mineral Property Notice of Lien Claim and Statement of Privilege in the principal amount of $46,500 on November 5, 2012, which was within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded Canrig Drilling Technology, Ltd. Lien Affidavit is attached as **Exhibit 6**, without exhibits.

10.     Champion Technologies, Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than April 29, 2010 and provided services to ATP until August 10, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Champion Technologies, Inc. filed its Statement and Notice of Privilege and Lien in the principal amount of $176,280 on August 24, 2012, which was within 180 days of the last date of service for the Subject Properties.  A true and correct copy of the recorded Champion Technologies, Inc. Lien Affidavit is attached as **Exhibit 7**, without exhibits.

11.     Offshore Energy Services, Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 2, 2012 and provided services to ATP until April 30, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Offshore Energy Services, Inc. filed its Statement and Notice of Privilege and Lien in the principal amount of $949,157 on October 23, 2012, which was within 180 days of the last date of service for the Subject Properties.  A true and correct copy of the recorded Offshore Energy Services, Inc. Lien Affidavit is attached as **Exhibit 8**, without exhibits.

12.     Stabil Drill Specialties, L.L.C. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 1, 2012 and provided services to ATP until

June 30, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties. Stabil Drill Specialties, L.L.C. filed its two Statements of Oil and Gas Well Privilege and Liens in the principal amounts of $6,025 and $11,020 on August 8, 2012, which was within 180 days of the last date of service for the Subject Properties. True and correct copies of the recorded Stabil Drill Specialties, L.L.C. Lien Affidavits are attached, *in globo,* as **Exhibit 9**, without exhibits.

13.     Warrior Energy Services Corporation began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 10, 2012 and provided services to ATP until May 17, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties. Warrior Energy Services Corporation filed its Statement of Oil and Gas Well Privilege and Lien in the principal amount of $1,271,328 on August 3, 2012, which was within 180 days of the last date of service for the Subject Properties.  A true and correct copy of the recorded Warrior Energy Services Corporation Lien Affidavit is attached as **Exhibit 10**, without exhibits.

14.     Harvey Gulf International Marine, LLC began furnishing materials, equipment, labor and/or services to the Subject Properties not later than May 31, 2009 and provided services to ATP until May 2, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Harvey Gulf International Marine, LLC filed its Oil Well Lien Affidavit of Lien and Privilege in the principal amount of $2,885,133.50 on July 30, 2012, which was within 180 days of the last date of service for the Subject Properties.  True and correct copies of the recorded Harvey Gulf International Marine, LLC Lien Affidavits are attached *in globo* as **Exhibit 11**, without exhibits.

15.     Expeditors and Production Services, Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than May 8, 2010 and provided services to

ATP until August 9, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Expeditors and Production Services, Inc. filed its Statement of Privilege in the principal amount of $77,407.49 on October 2, 2012, then on June 9, 2014 filed an Act of Correction, along with a Supplemental and Amended Statement of Privilege in the amount of <u>$235,161.40</u>, which was within 180 days of the last date of service for the Subject Properties.   True and correct copies of the recorded Expeditors and Production Services, Inc. Lien Affidavits are attached *in globo* as **<u>Exhibit 12</u>**, without exhibits.

16.     EPS Cargo Handlers Company, Inc. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 8, 2010 and provided services to ATP until August 3, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  EPS Cargo Handlers Company, Inc. filed its Notice of Construction Lien on Oil, Gas and Mineral Property in the principal amount of <u>$113,200.00</u> on October 2, 2012, which was within 180 days of the last date of service for the Subject Properties.  True and correct copies of the recorded EPS Cargo Handlers Company, Inc. Lien Affidavits are attached *in globo* as **<u>Exhibit 13</u>**, without exhibits.

17.     Hornbeck Offshore Services, LLC began furnishing materials, equipment, labor and/or services to the Subject Properties not later than November 27, 2009 and provided services to ATP until August 17, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Hornbeck Offshore Services, LLC filed its Affidavit of Lien and Privilege in the total principal amount of <u>$ 4,710,587.74 </u> on September 14, 2012, which was within 180 days of the last date of service for the Subject Properties.  True and correct copies of the recorded Hornbeck Offshore Services, LLC Lien Affidavits are attached *in globo* as **<u>Exhibit 14</u>**, without exhibits.

18.     Fastorq, L.L.C. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than May 15, 2012 and provided services to ATP until July 5, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Fastorq, L.L.C. filed its Statement of Oil and Gas Well Privilege and Lien in the total principal amount of $36,403 on August 7, 2012, which was within 180 days of the last date of service for certain of the Subject Properties.  Fastorq, L.L.C. filed a second Statement of Oil and Gas Well Privilege and Lien in the principal amount of $3,671 on August 8, 2012, related to materials, equipment, labor and/or services furnished to certain of the Subject Properties. This second Lien Affidavit was also filed within 180 days of the last date of service for the Subject Properties. A true and correct copy of the recorded Fastorq, L.L.C. Statements of Oil and Gas Well Privilege and Lien International, Inc. are attached *in globo* as **Exhibit 15**, without exhibits.

19.     Workstrings International, L.L.C. began furnishing materials, equipment, labor and/or services to the Subject Properties not later than March 1, 2012 and provided services to ATP until April 18, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Workstrings International, L.L.C. filed its Statement of Oil and Gas Well Privilege and Lien in the principal amount of $41,082.60 on August 8, 2012, which was within 180 days of the last date of service for the Subject Properties.  True and correct copies of the recorded Workstrings International, L.L.C. Lien Affidavits is attached as **Exhibit 16**, without exhibits.

20.     Superior Energy Services, L.L.C. d/b/a Superior Completion Services began furnishing materials, equipment, labor and/or services to the Subject Properties not later than June 14, 2012 and provided services to ATP until June 21, 2012, without a gap of more than 90 days between service dates with respect to services furnished for the Subject Properties.  Superior Energy Services, L.L.C. d/b/a Superior Completion Services filed its Statement of Oil and Gas

Well Privilege and Lien in the principal amount of <u>$819,894.66</u> on August 7, 2012, which was within 180 days of the last date of service for the Subject Properties.  True and correct copies of the recorded Superior Energy Services, L.L.C. d/b/a Superior Completion Services Statement of Oil and Gas Well Privilege and Lien is attached as **Exhibit 17**, without exhibits.

21.     June 20, 2011, OHA and ATP executed a (i) Purchase and Sale Agreement and ("<u>Original PSA</u>") and (ii) Conveyance of Term Overriding Royalty Interest ("<u>Original Conveyance</u>"), which was recorded in the Records for Plaquemines Parish, Louisiana on June 23, 2011 whereby ATP conveyed to OHA (a) a term overriding royalty interest in Mississippi Canyon Block 755 ("<u>MC 755</u>"), Mississippi Canyon Block 754 ("<u>MC 754</u>"), and Mississippi Canyon Block 711 ("<u>MC 711</u>").  *See* OHA's Complaint (Adv. Doc. No. 1) at ¶ 9.  A copy of the Original PSA is attached **Exhibit 18**.  A copy of the Original Conveyance is attached as **Exhibit 19**.

22.     On December 29, 2011, OHA and ATP executed a (i) First Supplemental Purchase and Sale Agreement ("<u>First Supplemental PSA</u>"), and (ii) First Supplement and Amendment to Conveyance of Term Royalty Interest ("<u>First Supplemental Conveyance</u>"), recorded in Plaquemines Parish, Louisiana on January 6, 2012, whereby ATP conveyed additional term overriding royalty interests to OHA by increasing the Primary Sum used in the calculation of the termination of the term overriding royalty in MC 755, MC 754 and MC 711.  *See* OHA's Complaint (Adv. Doc. No. 1).  A copy of the First Supplemental PSA is attached **Exhibit 20**.  A copy of the First Supplemental Conveyance is attached as **Exhibit 21**.

23.     On July 2, 2012, ATP and OHA entered into a  (i) Second Supplemental Purchase and Sale Agreement for the purchase of a term overriding royalty interest for $25 million ("<u>Second Supplemental PSA</u>") and (ii) Second Supplemental and Amendment to Conveyance of Term Overriding Royalty Interest, recorded in Plaquemines Parish, Louisiana on July 23, 2012 whereby ATP conveyed to OHA a term overriding royalty interest in Mississippi Canyon Block 941 ("<u>MC</u>

941") and Mississippi Canyon Block 942 ("MC 942") and Atwater Canyon Block ("AT 63").  A true and correct copy of the Second Supplemental PSA is attached **Exhibit 22**.  A true and correct copy of the recorded Second Supplemental Conveyance is attached as **Exhibit 23**.

24.     At the time OHA acquired its respective ORRIs, OHA had constructive knowledge, and upon information and belief (subject to confirmation through discovery) had actual knowledge, that the M&M Intervenors had furnished their respective materials, equipment, labor and or services in connection with the development of the Subject Properties in which OHA invested and that the M&M Intervenors held statutory privileges to secure the price of their respective contracts for operations under the Louisiana Oil Well Lien Act ("LOWLA").[2]

## PROCEDURAL BACKGROUND

25.     ATP filed its voluntary petition in bankruptcy on August 17, 2012.  On August 23, 2012, the Court entered an order in Bankruptcy Case No. 12-36187 titled: *Order Regarding Debtor's Emergency Motion for an Order Authorizing (1) Payment of Funds Attributable to Overriding Royalty Interests in the Ordinary Course of Business and (2) Payment of Funds Attributable to Net Profits Interests Subject to Further Order of the Court Requiring Disgorgement Thereof Pursuant to (A) Sections 105(a), 363(b) and 541(a) of the Bankruptcy Code and (B) the Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Southern District of Texas* [Bankruptcy Case Docket No. 191] (the "ORRI and NPI Payment Order").  The ORRI and NPI Payment Order authorized ATP to, *inter alia*, distribute proceeds of production to ORRI and NPI interest holders including OHA (f/k/a NGP), subject to (i) the

---

[2] Both sides agree that LOWLA is the applicable lien statute here as the Subject Properties are located adjacent to the State of Louisiana. *See Cutting Underwater Techs. USA, Inc. v. Con-Dive, L.L.C.*, No. 09-387, 2011 U.S. Dist. LEXIS 29325 (E.D. La. March 22, 2011) ("Congress declared that to the extent that they are applicable and not inconsistent with [federal law], the laws of the adjacent states are the law[s] of the United States on the OCS… [t]he Louisiana Oil Well Lien Act (LOWLA) was significantly revised in 1995… [t]he revisions have not, however, disturbed the view of the Fifth Circuit that LOWLA is applicable as federal surrogate law under the OCSLA.") (internal quotations and citations omitted), affirmed per curiam by *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512 (5th Cir. 2012).

execution by the Subject Interest Holder of a Disgorgement Agreement (as defined therein) and

(ii) the rights of any party in interest claiming to hold a mechanic's and materialman's or similar

statutory lien or privilege to seek disgorgement of such payments upon showing that such parties'

liens would extend to the distributed proceeds and be superior to the interest of any of the ORRI

or NPI holders.

26.　　Specifically, the ORRI and NPI Payment Order provides in relevant part:

"…(iii) the right of any party in interest claiming to hold a mechanic's and materialman's or similar statutory lien or privilege on any property to which a Subject Interest relates, to assert in a proper proceeding that such party's lien or privilege (A) extends to any such funds distributed pursuant to this Order, (B) is senior and superior to the interests of any such Subject Interest holder, or (C) to seek disgorgement, turnover or other relief in connection therewith .... are fully preserved … any holder of an alleged lien that is alleged to encumber any such Subject Interest ... shall be entitled to seek a declaration of relative rights with respect to any Subject Interest or proceeds thereof pursuant to a contested matter and to seek expedited hearing on any motion brought seeking such a declaration; provided, that any party-in-interest may demand that such contested matter be treated as an adversary proceeding with the adversary rules to apply." See Docket No. 191, pages 2-3.

27.　　Pursuant to the ORRI and NPI Payment Order, OHA, among other ORRI holders,

executed Disgorgement Agreements which provide in relevant part that:

"WHEREAS, under the Royalty and NPI Distribution Order the Debtor is directed to distribute proceeds of production received by the Debtor from and after the Petition Date that are attributable to (1) the Overrides described on Exhibit A to the Motion, (2) the Financial NPIs or Vendor NPIs described on Exhibit A to the Motion, or (3) any perpetual override conveyed by the Debtor (collectively, the "Subject Interests"), in accordance with the conveyances and other transaction documents evidencing such Subject Interest (the "Transaction Documents") pursuant to the terms of that Royalty and NPI Distribution Order.

WHEREAS, pursuant to the Royalty and NPI Distribution Order, as a condition to receiving any distribution on account of its Subject Interest received from the Debtor, the holder thereof (each, a "Holder") must agree, in writing, that upon entry of a final and appealable order of the Bankruptcy Court (the Bankruptcy Court will determine whether its order is final) directing that any or all of the post-petition distributions made by the Debtor and received by the Holder on account of its Subject Interest pursuant to the Royalty and NPI Distribution Order must be disgorged and Paid to the Debtor's estate (the "Disgorgement Order"), such Holder will, within thirty (30) days of the date on which such Disgorgement Order is entered on the docket in this case, comply with the terms of the Disgorgement Order by repaying or returning to the Debtor's estate that portion of the

postpetition distribution (whether some or all) directed by the terms of the Disgorgement Order.

NOW, THEREFORE, the Debtor and the undersigned hereby agree as follows:

1.      Without waiving any rights, claims or defenses that it may have (except for the waiver of the rights to obtain a stay pending appeal of any disgorgement order, as set forth below) the undersigned (the "Subject Interest Holder") hereby elects to have the Debtor distribute to it the proceeds of production received by the Debtor after the Petition Date and attributable to the Subject Interest Holder in accordance with its Transaction Documents, subject to the terms of this Agreement to Disgorge Funds Upon Order of the Bankruptcy Court ("Disgorgement Agreement").

2.      Without waiving any rights, claims or defenses that it may have, Debtor shall distribute to the Subject Interest Holder, during the pendency of this case, the proceeds of production received by the Debtor after the Petition Date and attributable to the Subject Interest Holder in accordance with its Transaction Documents.

3.      As an express condition to its receipt of the distribution of proceeds of production set forth in Paragraph 2 above, the Subject Interest Holder agrees and shall, within thirty (30) days of the date on which a Disgorgement Order respecting the Subject Interest Holder is entered on the docket in this Case, deliver in available funds to the Debtor and its estate the amount the Subject Interest Holder is required to disgorge by such Disgorgement Order.  The Subject Interest Holder agrees that, notwithstanding any right of appeal (which right is fully preserved), the Subject Interest Holder as a condition of receiving the funds waives the right to obtain a stay pending appeal of a Disgorgement Order and shall be obliged to return the funds, in cash, pending the outcome of the appeal.

4.      Debtor and the Subject Interest Holder each acknowledge and agree that they are entering into this Agreement to Disgorge Funds Upon Order of the Bankruptcy Court pursuant to the Royalty and NPI Distribution Order and nothing herein is intended to, nor shall be deemed to, alter or amend the terms of such Royalty and NPI Distribution Order.  Debtor and Subject Interest Holder further acknowledge and agree that the treatment of any amounts actually disgorged by the Subject Interest Holder pursuant to the Disgorgement Order are governed by the terms of the Royalty and NPI Distribution Order. Except for the waiver of a right to obtain a stay pending appeal of any Disgorgement Order, Debtor and Subject Interest Holder further acknowledge and agree that neither party waives, releases or surrenders any right, claim, defense or entitlement that it may have and that this Disgorgement Agreement is entered into solely for the purpose of facilitating distributions of proceeds of production during the pendency of the Debtor's chapter 11 proceeding and subject to further order of the Bankruptcy Court."

28.     This Court further confirmed the intent of the Court's Order with respect to M&M

Intervenors' rights under the ORRI and NPI Payment Order and related Disgorgement Agreements

at the hearing at which the ORRI and NPI Payment was entered stating that "this is injunctive-type

relief…and this is the form of the injunction." *See* August 23, 2012 Hearing Transcript, pages 84-85, lines 22-25 and 1.

29.     On October 17, 2012, Plaintiff filed its complaint initiating the above-referenced adversary proceeding (the "Complaint") [Docket No. 1].  The Complaint sought a declaratory judgment that certain perpetual overriding royalty interests, term overriding royalty interests and net profits interests (collectively, the "Conveyances") were: (i) property of the Plaintiffs and not property of ATP's estate and (ii) not executory contracts or lease interests that ATP could reject. Shortly thereafter, M&M Intervenors filed motions to intervene in this adversary to assert their respective claims as contemplated in the ORRI and NPI Payment Order.

30.     On November 28, 2012, the Court entered an Order allowing M&M Intervenors to intervene in the adversary proceeding [Docket No. 50].  M&M Intervenors thereafter filed the below listed complaints in intervention (the "Complaints in Intervention"), which are incorporated herein for all purposes, seeking, *inter alia*: (i) declaratory judgments that the Conveyances from ATP to the Plaintiffs were transferred subject the M&M Intervenors' liens (as applicable) and (ii) disgorgement and turnover of payments made by ATP to the Plaintiffs pursuant to the Conveyance instruments, ORRI and NPI Payment Order and Disgorgement Agreements.

| Date | Docket No. | Description |
|---|---|---|
| 12/13/2012 | 63 | Intervenor Complaint 4:12-ap-3443 by Fastorq, L.L.C., Stabil Drill Specialties, L.L.C., Superior Energy Services, L.L.C., d/b/a Superior Completion Services, Warrior Energy Services Corporation, Workstrings International, L.L.C. against ATP Oil & Gas Corporation, NGP Capital Resources Company. (Attachments: # 1 Exhibit A) (Kadden, Benjamin) (Entered: 12/13/2012) |
| 12/13/2012 | 64 | Intervenor Complaint 4:12-ap-3443 by EPS Cargo Handlers Company, Expeditors and Production Services Company, Harvey Gulf International Marine Inc, Hornbeck Offshore Services, LLC against ATP Oil & Gas Corporation, NGP Capital Resources Company. (Attachments: # 1 Exhibit A) (Cheatham, Robin) (Entered: 12/13/2012) |
| 12/13/2012 | 65 | Intervenor Complaint 4:12-ap-3443 by Canrig Drilling Technology, Ltd., M-I L.L.C. d/b/a M-I SWACO, Nabors Offshore Corporation, Schlumberger |

| Date | Docket No. | Description |
|---|---|---|
|  |  | Technology Corporation, Smith International, Inc., Supreme Service & Specialty Co Inc, Wireline Control Services, LLC against ATP Oil & Gas Corporation, NGP Capital Resources Company. (Attachments: # 1 Index # 2 Exhibit A-1# 3 Exhibit A-2# 4 Exhibit B# 5 Exhibit C-1# 6 Exhibit C-2# 7 Exhibit D# 8 Exhibit E-1# 9 Exhibit E-2# 10 Exhibit F# 11 Exhibit G-1# 12 Exhibit G-2) (Green, Kenneth) (Entered: 12/13/2012) |
| 12/13/2012 | 66 | Intervenor Complaint 4:12-ap-3443 by Champion Technologies, Inc., Offshore Energy Services, Inc. against NGP Capital Resources Company. (Attachments: # 1 Exhibit) (Rubenstein, Michael) (Entered: 12/13/2012). |
| 9/4/2013 | 131 | First Amended Intervenor Complaint 4:12-ap-3443 by EPS Logistics Company, Expeditors and Production Services Company, Harvey Gulf International Marine Inc, Hornbeck Offshore Services, LLC against ATP Oil & Gas Corporation, NGP Capital Resources Company. (Attachments: # 1 Exhibit A) (Cheatham, Robin). Related document (s) 64 Complaint filed by Creditor Harvey Gulf International Marine Inc, Creditor Hornbeck Offshore Services, LLC, Creditor Expeditors and Production Services Company, Creditor EPS Cargo Handlers Company. (Entered: 09/04/2013) |
| 2/15/2016 | 282 | Second Amended Complaint (Related document(s):[1] Complaint) (Cheatham, Robin) |

31.     On November 29, 2012, the Court entered its First Amended Case Management Order [Docket No. 57] (the "Phase 1 Scheduling Order").  Pursuant to the Phase 1 Scheduling Order, the Court bifurcated this adversary proceeding such that the issues of (i) whether the Conveyances constituted an outright transfer of ownership such that the Subject Interests are not property of ATP's estate and (ii) whether the Conveyances were executory contracts (collectively the "Financing Issues") would be adjudicated in the first phase of this ligation with all other claims, including those of the M&M Intervenors, to be adjudicated after the Court's determination of the Financing Issues.

32.     On May 20, 2014, the Court entered an Order substituting Bennu for ATP in this action in connection with any claims that relate to the Purchased Assets, which include the Subject Properties [Docket No. 172].

33.     On September 3, 2014, Plaintiff and Bennu filed a Joint Motion to Dismiss Claims Without Prejudice ("Motion to Dismiss Claims between Plaintiffs and Bennu") [Docket No. 187], which stated that Plaintiffs and Bennu reached a settlement which resolved all claims relating to the Financing Issues as to OHA, including any "recharacterization" claims relating to OHA's Conveyances and ORRIs, which were purchased by Bennu.

34.     On February 3, 2016, OHA filed its Amended Motion Dismiss the Complaints in Intervention Filed by the Statutory Lien Claimants [Docket No. 274].

35.     On February 4, 2016, the Court entered an Agreed Final Judgment as between the claim between Bennu and OHA as to the Phase I financing issues. [Doc 276].  The rights of the M&M Intervenors to assert the lien rights was unaffected by the Agreed Final Judgment.

36.     Also on February 4, 2016, the Court held a status conference and entered a briefing schedule for the M&M Intervenors to file their response to the Amended Motion to Dismiss and set forth a hearing for oral arguments [Doc. 277].

37.     On March 3, 2016, OHA filed its Second Amended Motion to Dismiss the Complaints in Intervention Filed by the Statutory Lien Claimants ("Second Amended Motion to Dismiss") [Docket No. 284].

### RESPONSE TO SECOND AMENDED MOTION TO DISMISS

38.     **Legal standard applicable to a motion to dismiss under FRCP 12(b)(6)**.  Motions to dismiss under Rule 12(b)(6) are "viewed with disfavor" and "rarely granted." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Although complaints must provide more than labels and conclusions, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations…."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss under Rule 12(b)(6) is appropriate only if the plaintiff has not provided fair notice of its claim and factual allegations that—when accepted as true—are plausible and rise

above mere speculation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678; 129 S. Ct. 1937, 1949 (2009); *Twombly*, 550 U.S. at 555. A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *See, e.g., Ashcroft*, 129 S. Ct. at 1949.

39.     When considering the Second Amended Motion to Dismiss, the Court must assume that all plausible facts contained in the Complaints in Intervention are true and view them in the light most favorable to the M&M Intervenors. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Twombly*, 550 U.S. at 555-56; *Ashcroft*, 129 S. Ct. at 1950. All reasonable inferences are to be drawn in favor of the M&M Intervenors' claims. *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "The issue is not whether a [claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)). Finally, if a court considers evidence submitted with a 12(b)(6) motion, the motion is automatically converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *L.P. Commercial Corp. v. Caudill*, 870 F. Supp. 743, 747 n.1 (S.D. Tex. 1994) (citing *Exxon Corp. v. Maryland Cas. Co.*, 599 F.2d 659, 661 (5th Cir. 1979)).

40.     **Response No. 1 – OHA's argument that the M&M Intervenors' statutory privileges cannot attach to its ORRIs is wrong and not supported by applicable Louisiana law.** OHA misconstrues the M&M Intervenors' legal basis for their claims that their statutory privileges attached to ATP's entire operating interest, which now includes OHA's ORRIs. M&M Intervenors do not assert that their statutory privileges would attach to and encumber any valid and perfected pre-existing ORRIs derived from ATP's operating interest <u>prior</u> to any of the M&M

Intervenor's lien inception dates; rather in their Complaints in Intervention, the M&M Intervenors assert that their liens had already attached to ATP's operating interest in the Subject Properties prior to the recordation date of OHA's ORRIs. As a result, OHA received and recorded its ORRIs—which were carved out of ATP's operating interest—already burdened by the Subject Privileges.  The Complaints in Intervention allege sufficient facts to support M&M Intervenors' causes of action. Notably, OHA fails to cite any authority wherein a Louisiana court has adopted their interpretation of Section 9:4863 of LOWLA, which is that ORRIs can never be encumbered by a mineral contractor's lien even when the ORRIs are carved out of an operating interest already encumbered by the contractor's lien. All applicable law, and statutory reasoning, is to the contrary.

41.     The M&M Intervenors each hold valid and perfected statutory privileges provided under applicable state law and adopted by federal surrogate law under OCSLA.  The Subject Privileges, which encumber the Subject Properties and the Subject Interests as described in the Complaints in Intervention and exhibits thereto, are valid, perfected, timely-filed, pre-existing and secure the indebtedness stated therein.[3]

42.     Each of the Subject Privileges attached to ATP's operating interest in the Subject Properties at the time each of the respective M&M Intervenors first began furnishing their respective services.  *See Grasso Prod. v. BMO Fin.* (*In re Century Offshore Mgmt. Corp.*), 83 F.3d 140, 144-45 (6th Cir. 1996) (The "1995 amendments to the Oil, Gas, and Water Wells Lien Act make clear that statutory liens rank from the date services were first provided, not the date of first unpaid service…[t]hus, under the new Lien Act the privilege clearly secures the entire cost of labor or services, not just any unpaid amounts.")

---

[3]  Plaintiffs do not allege that the M&M Intervenors have failed to state a claim regarding the validity and perfection of the Subject Privileges.

43.    OHA's ORRIs were subsequently carved out of ATP's operating interest in the Subject Properties. Numerous Louisiana courts have defined the term overriding royalty. The term overriding royalty is used to describe a royalty carved out of the working interest created by an oil and gas lease. *Frey v. Amoco Prod. Co.*, 603 So.2d 166, 171 n.8 (La. 1992); *Pinnacle Operating Co. v. ETTCO Enters.*, 914 So.2d 1144, 1146 n.3 (La. App. 2d Cir. 2005); *Total E&P USA, Inc. v. Kerr-Mcgee Oil & Gas Corp.*, 719 F.3d 424, 447 (5th Cir. 2013)(citing *Fontenot v. Sun Oil Co.*, 243 So. 2d 783 (La. 1971)). However, a working interest owner cannot convey more than it owns, and any conveyance is subject to all liens and encumbrances existing at the time of the conveyance. *Murray v. A&T Well Serv.* (*In re Leeward Operators, LLC*), 2012 Bankr. LEXIS 1215 at *8 (Bankr. W.D. La. Mar. 21, 2012) ("A Louisiana oil and gas privilege outranks any mortgages or other privileges that become effective against third parties after the oil and gas privilege is established."); *see also Bayou Contrs. v. Brown*, 693 So. 2d 1249, 1254 (La. App. 1st Cir. 1997) ((holding that when real property interests are transferred, "the property conveyed is burdened with any previously or subsequently recorded encumbrances") (*citing Quality Fin. Co. of Donaldsonville, Inc. v. Bourque*, 315 So. 2d 656, 659 (La. 1975)).

44.    Under LOWLA, a statutory lien claimant has a statutory privilege (lien) to secure obligations owed to the contractor by the operator, as summarized below[4].

---

[4] The following defined terms in La. R.S. 9:4861 are relevant to the scope of the privilege:

**Operating interest**: an "operating interest" is a mineral lease or sublease of a mineral lease, or an interest in a lease or sublease that gives the lessee, either singly or in association with others, the right to conduct the operations giving rise to the claimant's privilege. A mineral lease or sublease or an interest in the lease or sublease, is not an operating interest if an owner has divested himself of the right to conduct the operations giving rise to the claimant's privilege by assignment, sublease, or another form of mineral right before the claimant's privilege is established. A contract, such as one which commonly is referred to in the industry as a "farm-out" or "farm-in", by which a lessee agrees to sublease or transfer all or part of his rights in a lease to another person, commonly referred to as a "farmee", upon the drilling of a well or completion of some other operations, but which does not then vest such interest in the farmee, is not an operating interest until the sublease or transfer is made, and until then the farmee is a contractor of the lessee for the purposes of this Part.

45.    Under La. Rev. Stat. 9:4862(A), the privilege secures the following obligations:

"(1) A contractor for the price of his contract for **operations** [defined in footnote 4].

(2) Interest due on the amount of the obligation.

(3) The cost of preparing and filing the statement of privilege and notice of lis pendens.

(4) The amount of reasonable attorney fees not to exceed ten percent if an attorney is employed to enforce the obligation."

46.    Under La. Rev. Stat. 9:4863(A), the privilege attaches to the following property interests:

"(1) The **operating interest** [defined in footnote 4] under which the operations giving rise to the claimant's privilege are conducted together with the interest of the **lessee** [defined in footnote 4] of such interest in a:

(a)   Well, building, tank, leasehold pipeline, and other construction or facility on the **well site** [defined in footnote 4].

(b)   Movable on a well site that is used in operations, other than a movable that is only transiently on the well site for repair, testing, or other temporary use.

(c)   Tract of land, servitude, and lease described in La. Rev. Stat. 9:4861(12)(c)

---

**Operator**: an "operator" is a lessee who is personally bound by contract to the claimant or to a contractor from whom the claimant's activities giving rise to the privilege emanate.

**Operations** are every activity conducted by or for a lessee on a well site for the purpose of:

(i) Drilling, completing, testing, producing, reworking, or abandoning a well.

(ii) Saving, treating, or disposing of hydrocarbons or other substances produced from a well.

(iii) Injecting substances into the earth to produce or enhance the production of hydrocarbons.

**Lessee**: a "lessee" is a person who owns an operating interest.

**Participating lessee**: a "participating lessee" is a lessee who is not the operator, but who is personally bound by contract to the operator to pay or reimburse the operator for any part of the obligation secured by the privilege or for any part of the price of the contract of the contractor from whom the operations giving rise to the claimant's privilege emanate.

**Non-participating lessee**: a "non-participating lessee" is a lessee who is neither an operator nor a participating lessee.  A non-participating lessee does not become a participating lessee because an operator, contractor, or the claimant has the right to recover all or part of the obligation secured by the privilege out of hydrocarbons attributable to the interest of the lessee in the operating interest or from the lessee's share of the proceeds derived from such hydrocarbons, or out of other property of the lessee.

**Well Site**: a "well site" is the area covered by: (a) the operating interest; (b) a unit in which the operating interest participates; (c) a tract of land or the area covered by a servitude or predial lease of the lessee on which is located a well drilled to, producing from, or injecting substances into the area covered by the operating interest.

covering the well site of the operating interest.

(2) Drilling or other rig located at the well site of the operating interest if the rig is owned by the operator or by a contractor from whom the activities giving rise to the privilege emanate.

(3) The interest of the **operator** [defined in footnote 4] and **participating lessee** [defined in footnote 4] in hydrocarbons produced from the operating interest and the interest of a **non-participating lessee** [defined in footnote 4] in hydrocarbons produced from that part of his operating interest subject to the privilege.

(4) The proceeds received by, and the obligations owed to, a lessee from the disposition of hydrocarbons subject to the privilege."

(emphasis added).

47.     Under La. R.S. 9:4863(B) and (C), the privilege is limited with respect to certain types of property interests:

"B. The privilege that results from operations on a voluntary or compulsory unit affects only that part of a non-participating lessee's interest in the operating interest located within the boundaries of the unit and only insofar as the unit covers and affects the unitized zone or formation. The privilege affects only the interest of the non-participating lessee in the other property described in Subsection (A)(1) and (2) of this Section that is used in the operations of the unit well.

C. The privilege does not affect:

(1) That part of hydrocarbons produced from an operating interest that **is owned** by a lessor, sublessor, overriding royalty owner, or other person who is not a lessee of the operating interest.

(2) The obligations or proceeds arising from the disposition of such hydrocarbons that **are owned** by or payable to such persons.

D. The lien and privilege provided for in this Subpart shall not attach or apply to any rigs, machinery, appurtenances, appliances, equipment, or other related equipment moved onto the lease for the purpose of plugging and abandoning the well or wells and closing associated pits thereon in compliance with an order issued by the commissioner of conservation after public hearing in accordance with the provisions of R.S. 30:1 et seq. Additionally, the lien and privilege provided for in this Subpart shall not attach or apply to any casing, tubing, pipe, and other tubular goods recovered from the drill hole as a result of such plugging and abandoning operations."

(emphasis added).

48.     Plaintiff relies on Section 9:4863(C) above to support their argument that the M&M Intervenors' privileges do not attach to its ORRIs. Although Plaintiffs contend that the M&M

21

Intervenors ignore Section 9:4863(C) in their Complaints in Intervention, as further explained below, M&M Intervenors do in fact address Section 9:4863(C) by demonstrating its inapplicability to this case.

49.     The M&M Intervenors allege in their Complaints in Intervention that the Subject Privileges attached to the entirety of ATP's operating interest owned by ATP as of the time the M&M Intervenors first began providing goods and services to or for the Subject Properties, and also to any proceeds of ATP's operating interest, including proceeds from the disposition of hydrocarbons, and that the Subject Privileges were established prior to assignment of OHA's ORRIs.  LOWLA provides that the oil and gas privilege "**is established and is effective as to a third person** when (1) [t]he claimant, who is a contractor, laborer, or employee **begins rendering services** at the well site [or] (2) [m]ovables sold by the claimant to an operator or contractor are delivered to the well site. . . ."  La. Rev. Stat. 9:4864(A) (emphasis added).

50.     "[E]ven prior to the recordation of a notice [statement] of privilege, the lien is effective as to third persons [i.e., those not contractually bound to the claimant] as of the date of such first provision of services, equipment or other operations."  Patricia H. Chicoine, Lien on LOWLA; It's a Privilege: Recent Revisions to the Louisiana Oil Well Lien Act, 57 La. L. Rev. 1133, 1150 (1997) (citing La. Rev. Stat. 9:4864(A)).

51.     In contrast, OHA's ORRIs were not effective against the M&M Intervenors or any other third persons until recorded. La. Civ. Code art. 3338 provides that "[t]he rights and obligations established or created by the following written instruments are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records pursuant to the provisions of this Title:

(1) An instrument that transfers an immovable or establishes a real right in or over an immovable.

22

(2) The lease of an immovable.

(3) An option or right of first refusal, or a contract to buy, sell or lease an immovable or to establish a real right in or over an immovable.

(4) An instrument that modifies, terminates, or transfers the rights created or evidenced by the instruments described in Subparagraphs (1) through (3) of this Article."

This statute is known as the Louisiana Public Records doctrine and is applicable to ORRIs. *See Freeman v. Block "T" Operating, LLC*, 118 So. 3d 1279, 1283-84 (La. App. 3d Cir. 2013) (applying the statute to unrecorded overriding royalty interests).

52.     The Fifth Circuit recently considered a similar issue under Texas law in *Acme Energy Servs., Inc. v. Heritage Consol., LLC* (*In re Heritage Consol., LLC*), 765 F.3d 507 (5th Cir. 2014). There, the Court looked at Texas M&M lien law, which, like LOWLA, provides that a properly recorded mineral lien relates back and is established as of the time the services or materials were first provided and attaches to whatever legal or equitable interest the contracting party had when the work began. *Id.* at 514. After the work has begun, the interest to which the lien attaches can be enlarged, through the after-acquired title doctrine, but not diminished by a transfer of interests by the contracting party. *Id*. Subsequent assignments of interests by the party for whom the mineral contractor did the work cannot diminish the contractor's lien rights. *Id*. at 516. As noted by the Fifth Circuit, "if subsequent contracting [i.e. assignments of interests] by the owner of any portion of the mineral interest, no matter how small and whether or not the interest is filed of record, precluded a subcontractor's lien, then laborers would have little remedy for nonpayment." *Id*.

53.     The Subject Privileges were established and became effective against third parties such as OHA when each M&M Intervenor began providing goods and services to or for the well site. The M&M Intervenors have each alleged that they began providing services prior to the time that OHA was assigned and recorded its ORRIs. The M&M Intervenors maintained the perfection

of their respective privileges through the timely filing of statements of privilege and notices as required under LOWLA and/or the Bankruptcy Code.  Accordingly, the Subject Privileges were established and effective when OHA received it ORRIs.

54.     Section 9:4863(C) states that the privilege does not affect hydrocarbons or proceeds thereof that **are owned** by an overriding royalty owner.  Section 9:4863 only addresses the property affected (or not affected) by a privilege at the time it comes into existence.  It is temporally limited to the inception of the lien and is of no application to conveyances after that time. Thus, pursuant to the language of the statute, a privilege does not attach to ORRIs that **are owned** as of the time the privilege is established. However, at the time the Subject Privileges became effective, the ORRIs were not yet owned by OHA; it acquired the ORRIs after the Subject Privileges were established and effective.  Accordingly, the Subject Privileges attached to the entirety of ATP's operating interest, from which the ORRIs were only *later* carved out. OHA therefore took the ORRIs burdened by the Subject Privileges.

55.     Further, as pointed out in *Chicone, supra*, the purpose of Section 9:4863(C) is to protect parties such as the landowner or lessor whose rights are established and effective <u>before</u> operations are commenced to develop the property and any statutory privileges arise. *Id*. at 1149 ("Historically, the Louisiana privilege has not been interpreted to attach to the landowner's property or the improvements thereon (since such interests were never recited in the statute).  The new Act clarifies prior law by excluding 'an operating interest that is owned by a lessor, sublessor, overriding royalty owner, or other person who is not a lessee of the operating interest,' as well as any 'obligations or proceeds' owed to such person.")  Plaintiffs ignore the plain language and legislative intent of LOWLA and instead lobby for an alternative interpretation that would exempt ORRIs carved out long after mineral contractor lien rights attached.

56.     If this were the law, then, as the Fifth Circuit pointed out in *Heritage*, every operator would simply assign all of the right to receive revenues to related parties through ORRIs carved out of the working interest, and those overrides would suddenly become lien-free.  Alternatively, an operator could assign all or a portion of the right to receive revenues to third parties in the form of an ORRI, such as OHA, in connection with efforts to obtaining financing or operating capital, effectively strip any pre-existing LOWLA liens and privileges, and retain the proceeds derived from the sale of such interest free and clear of any LOWLA liens.

57.     In each of these scenarios, the operator effectively deprives the claimant of any meaningful protection on account of it privilege and extinguishes the statutorily-provided privilege vis-à-vis third parties in contravention of intent of LOWLA and the clear language of Section 9:4865, which sets for an exhaustive list of the bases upon which a statutorily-provided privilege under LOWLA ceases to have effect at to third parties.

58.     **Response No. 2 – OHA's argument that attachment depends on whether Interest Owner is lessee and not on the time is wrong and not support by Louisiana law.** Louisiana law has consistently provided, both in statutes and in its case law, that the extent of an interest that the privilege attaches to is dependent on the timing of conveyances out of the operating interests. *JHJ Ltd. I v. Chevron U.S.A. Inc.*, 617 F.Supp 729, 732 (M.D. La. 1985) (finding that in a farmout situation, where unproven acreage of an productive lease is farmed out and privileges arise as a result of operations performed under the farmout agreement, but no assignments or subleases have yet been transferred prior to the commencement of operations, such privileges attach to the entire leasehold, including all production attributable to the lease, whether from wells physically situated on the lease of as a result of the leases inclusion in a producing unit.);  *Lor, Inc. v. Martin Exploration Co*, 489 So. 2d 1326 (La. Ct. App. 1986) (same); *J.S. Abercrombie Co. v. Lehulu Oil Co*, 160 So. 126, 126 (La. 1935) (finding that where an assignment of sublease of the

operating interest occurs prior to the activities giving rise to the privilege, only the operating interests subject to the sublease or assignment will be a "lessee of the operating interest" and subject to the privilege); La. R.S. 9:4663(C)(1).

59.     OHA argues that the statue simply does not allow privileges to attach to non-lessee interests, and that the court should not look at the timing of the assignment of the ORRI to OHA. However, OHA has not presented any case law showing that LOWLA should be applied in a vacuum without any regard to the timing of transfers or assignments. Rather, Louisiana case law has repeatedly held that the timing of assignments out of the lessee's or operator's interests is vital in determining what a privilege attaches to.

60.     Here the assignment of OHA's ORRIs did not occur until after the activities giving rise to the Subject Privileges commenced and therefore, the M&M Claimants privileges attached to the entirety of ATP's operating interests and continued to attach to any interest transferred subsequent to the commencement of activities giving rise to the Subject Privileges.

61.     **Response No. 3 – OHA's argument that it purchased the ORRI in a bona fide transaction is wrong.**  Section 9:4869 is inapplicable to OHA because OHA is neither a purchaser of hydrocarbons, nor a bona fide purchaser.

62.     OHA is not a purchaser of hydrocarbons, but a purchaser of an overriding royalty, thus, Section 9:4869 is inapplicable to OHA.  Even under to the terms of the Original Conveyance, OHA is only entitled to a royalty percentage of the proceeds received by ATP from a purchaser of the hydrocarbons. Under Section 1.1 of the Original Conveyance, ATP granted "an overriding royalty in and to the OCS Leases equal to the Applicable Royalty Percentage of all Hydrocarbons produced, saved, and sold from or attributable to the OCS Leases . . ." by the terms of the Conveyances, OHA was entitled to a royalty payment for each production month at a certain

royalty percentage of the Gross Proceeds (less transportation costs) received by Grantor.[5]   The Conveyance does not provide that OHA purchased any hydrocarbons, but only the right to receipt of a percentage of the amount of proceeds from ATP's sale of the hydrocarbons; the Conveyance stated that ATP still have the right to the hydrocarbons and to sell such hydrocarbons.[6]

63.     Even assuming that OHA were considered a purchaser of hydrocarbons, which is denied,  OHA cannot be considered a bonda fide purchaser, or at minimum, a fact question remains as to whether OHA is a bona fide purchaser and the facial attack set forth in this Second Amended Motion to Dismiss should be denied.  At the time OHA acquired its respective ORRIs, OHA had constructive knowledge, and upon information and belief (subject to confirmation through discovery) had actual knowledge, that the M&M Intervenors (as well as numerous other third parties) had furnished and were furnishing their respective materials, equipment, labor and or services in connection with the development of the Subject Properties in which OHA invested and that the M&M Intervenors held statutory privileges to secure the price of their respective contracts for operations.

64.     Again, if the law were as OHA argues, then, as the Fifth Circuit pointed out in *Heritage*, every operator would simply assign all of the right to receive revenues to related parties

---

[5] The Original Conveyance contains the following definitions:

"**Royalty Payment**" means, for each Production Month, an amount determined for each OCS Lease equal to the product obtained by multiplying (a) ten and eight tenths percent (10.8%) by (b) the positive difference (if any) obtained by subtracting (i) all Transportation costs actually paid by Grantor with respect to the Subject Hydrocarbons produced, saved, and sold from of allocable to such OCS Lease during or allocable to the relevant Production Month, from (ii) the Gross Proceeds actually received from time to time by or for the benefit of Grantor of all Subject Hydrocarbons actually received from time to time by or for the benefit of Grantor of all Subject Hydrocarbons produced, saved, and sold from of allocable to such OCS Lease during such Production Month.

"**Gross Proceeds**" means the gross amount received by, credited to, Grantor, from the sale of the Subject Hydrocarbons (net, in the case of crude oil, of deduction for costs of transportation, grade, quality, and similar matters to the extent taking into account in determining the price paid for such crude oil under the terms of the applicable crude oil sale and purchase contract(s)), subject to the following . . . (b) Amounts received by Grantor from a purchaser of Subject Hydrocarbons . . ."

[6] The Original Conveyance also recognized that "ATP's ownership of the Subject Interests [including operating rights] entitles ATP to a share of all hydrocarbons produced from or attributable to each OCS Lease and all proceeds therefrom."

through ORRIs carved out of the working interest, and those overrides would suddenly become lien-free.

65.     **Response No. 4 OHA's interpretation of LOWLA is against public policy and the purpose of LOWLA**.  LOWLA aims to protect contractors and subcontractors from the default of those who engage them.  The "purpose of [LOWLA] is to protect those, [] who contribute labor, services, and equipment to the drilling wells from the default of those who engage them."  *JHJ, Ltd*, 617 F.Supp at 733; *Lor Inc.*, 489 So. 2d 1326; *See Cutting Underwater Techs. USA, Inc. v. Con-Dive, LLC*,  No. 09-387, 2011 U.S. Dist. LEXIS 29325, *18-20 (E.D. La. Mar. 22, 2011)  ("Under LOWLA, a subcontractor may assert a lien over the property of an operator or lessee in order to secure 'the price of his contract for operations.'  By making available this privilege, the statute aims to 'protect [subcontractors] from the default of those who engage them.' As the Louisiana Supreme Court has observed, the statute reflects the 'policy decision that the lease owners are in a far better position to ensure payment for the subcontractor's services than is the subcontractor, and that the onus should be on the lease owners to ensure that the contractor it hires is solvent and that it actually makes payment to the subcontractor.' The statute 'clearly place[s] the risk of the contractor's insolvency or failure to pay on those with an interest in the lease.'") (quoting *Guichard Drilling Co. v. Alpine Energy Servs., Inc.*, 657 So. 2d 1307, 1312 (La. 1995)).

66.     Courts should interpret LOWLA in a manner which will effectuate its purposes, and the courts should not erect artificial barriers to its enforcement.  *Id.* at *36; *see also Phillips Petroleum Co. v. Best Oilfield Servs., Inc.*, 48 F.3d. 913, 916 (5th Cir. 1995) (noting that a "reasonable construction" must be considered before adopting a strict construction).

67.     The interpretation advanced by OHA would allow an operating interest owner to eliminate contractors' lien rights simply by transferring or carving out portions of its operating

interest after entering into agreements with contractors to provide materials and services and receiving the benefit of those services. For example, OHA reads LOWLA to mean that ATP could carve out an overriding royalty equal to ATP's entire working interest share of revenues for the benefit of OHA and leave M&M Intervenors with nothing but a meaningless lien against an operating interest that no longer has any right to any proceeds from the sale of hydrocarbons.

68.     OHA argues that its interpretation of LOWLA is supported by policies underlying oil and gas law; however, OHA cites no case law setting forth the purposes of either LOWLA or lien statutes. The only case cited by OHA is the *Ogden* case on the theory that the lien statutes extends prospectively; however, this case also states that "it is unlawful for any person to remove property to which a privilege [] has attached" and provides that "the privilege may nevertheless be enforced against property which has been removed from the site wherever the same may be located." *Ogden Oil Co. v. Servco*, 611 F. Supp. 572, 576 (Dist. M.D. La. 1985). This case, cited by OHA, does not support OHA's assertion that its interpretation supports oil and gas policy.

69.     The purpose of LOWLA is to protect lien claimants who have filed and perfected their liens in accordance with the statutory requirements, and the M&M Intervenors have each complied with their obligations under the lien statutes to perfect their privileges. If one could simply remove a lien or privilege by simply transferring part of the property to another, there would be no protection for lien claimants. An interpretation of the lien statutes that would cut off the M&M Intervenors' lien rights after they began providing services is an unreasonable construction of LOWLA and violates the public policy and purpose of LOWLA.

70.     **Response No. 5 – M&M Intervenors should be permitted to amend their complaints to address any perceived deficiency in their pleadings.** The M&M Intervenors maintain that they properly state claims upon which relief may be granted and that Plaintiffs is in reality challenging the merits of those claims rather than their plausibility. Further, as shown

above, Plaintiffs' challenge to M&M Intervenors' claims is without support under applicable Louisiana law and is dependent on a strained interpretation of LOWLA which would frustrate the very purposes for which the statute was enacted.

71.     Nonetheless, should the Court find any deficiency with respect to the M&M Intervenors' pleadings, the M&M Intervenors would request an opportunity to amend their Complaints in Intervention.  Amendment would be more appropriate than dismissal in this case; amendment could cure any possible deficiencies and would not prejudice the Plaintiffs.  *See United States ex rel. Steury v. Cardinal Health, Inc*., 625 F.3d 262 (5th Cir. 2010) (vacating judgment of dismissal to allow plaintiff opportunity to amend the complaint).

## REPORT AND RECOMMENDATION ON SECOND
## AMENDED MOTION TO DISMISS

72.     The M&M Intervenors submit that it is appropriate for this Court to consider the Second Amended Motion to Dismiss and submit a Report and Recommendation ("R&R") to the District Court. As stated in M&M Intervenors' Response OHA's Motion to Withdraw the Reference [Docket No. 283], the M&M Intervenors do not agree with OHA that withdrawal of the reference is mandatory but acknowledge that this Court likely does not have constitutional authority to enter a final judgment in this case, absent consent of all the parties. *Wellness Int'l Network, Ltd. v. Sharif* (*In re Sharif*), 575 U.S. ___, 135 S.Ct. 1932 (2015) (slip op. at 19-20, n.13), 2015 WL 2456619, at *12, n.13 (May 26, 2015).

73.     However, the M&M Intervenors believe that submitting an R&R on the Second Amended Motion to Dismiss concurrently with an R&R on the Motion to Withdraw the Reference would be consistent with (i) Southern District General Order 2012-6; paragraph 4; (ii) 28 U.S.C. §157(c)(1); (iii) this District's customary procedures regarding the review of bankruptcy court decisions by the District Court in the ordinary course (*see e.g*. District Court Orders on Motion to Withdraw the Reference and Motion for Leave to Appeal Interlocutory Summary Judgment Order

at Docket Nos. 204 and 205 in Adv. No. 12-03425; *Diamond Offshore Company v. ATP Oil & Gas Corp.*); and (iv) the approach taken by other bankruptcy courts when dealing with similar issues (*see e.g. Kirschner v. Agoglia* (*In re Refco Inc.*), 476 B.R. 75, 77 (S.D.N.Y. 2012) (holding that "(1) Under the doctrine of *Stern v. Marshall*, the Bankruptcy Court lacks the constitutional authority to enter final judgment on the Trustee's claims against the Movants, and therefore these claims must be adjudicated by an Article III court. (2) Nonetheless, the Bankruptcy Court does have lawful authority to conduct proceedings and issue a report and recommendation to the District Court on Movants' motion to dismiss, provided it is subject to de novo review."); *Reed v. Linehan* (*In re Soporex, Inc.*), 463 B.R. 344, 365 (Bankr. N.D. Tex. 2011)). Further, M&M Intervenors submit that an R&R on the Second Amended Motion to Dismiss would likely aid the District Court if the District Court elects to withdraw the reference and rule on the Second Amended Motion to Dismiss, which M&M Intervenors submit is permissive but not mandatory. Such an approach both "facilitates the expeditious resolution of bankruptcy cases and proceedings, over which the district court now must have greater involvement", *Soporex*, 463 B.R. at 365, and utilizes this Court's familiarity with the underlying issues involved in this adversary proceeding, ATP's business in general and the main bankruptcy case. Indeed a review of the docket shows that since October 2012, over 40 adversary proceedings have been filed in this Court relating to the ATP bankruptcy case which involve LOWLA liens, ORRIs and NPIs, or both.

<u>CONCLUSION</u>

74.    In their Complaints in Intervention, the M&M Intervenors plead and demonstrated with evidentiary support that they each have valid, perfected and timely-filed liens which were established before ATP's ORRI assignments to OHA, and therefore OHA's ORRIs were transferred burdened by the Subject Privileges. The Complaints in Intervention have set forth sufficient facts to state a claim for a declaratory judgment that the Subject Privileges attached to

31

OHA's ORRIs and a cause of action for turnover of past and future funds received by OHA under its ORRIs.  The M&M Intervenors ask that the Court deny OHA Investment Corporations' Second Amended Motion to Dismiss M&M Intervenor Complaints and for such other and further relief to which the M&M Intervenors are justly entitled.

*[Signatures appear on following pages]*

Respectfully submitted,

**SNOW SPENCE GREEN LLP**

By: /s/    Kenneth Green
     Phil F. Snow
     State Bar No. 18812600
     philsnow@snowspencelaw.com
     Kenneth Green
     State Bar No. 24036677
     kgreen@snowspencelaw.com
     Ross Spence
     State Bar No. 18918400
     ross@snowspencelaw.com
     2929 Allen Parkway, Suite 2800
     Houston, TX  77019
     (713) 335-4802
     (713) 335-4902 Fax

ATTORNEYS FOR SCHLUMBERGER
TECHNOLOGY CORPORATION, M-I
L.L.C. D/B/A M-I SWACO,  SUPREME
SERVICE & SPECIALTY CO INC.,
CANRIG DRILLING TECHNOLOGY,
LTD., SMITH INTERNATIONAL, INC.
AND WIRELINE CONTROL SERVICES,
LLC

**ADAMS AND REESE LLP**

By: /s/    Robin B. Cheatham
     Robin B. Cheatham
     So. District No. 18036
     robin.cheatham@arlaw.com
     One Shell Square
     701 Poydras Street, Suite 4500
     New Orleans, Louisiana 70139-4500
     (504) 581-3234
     (504) 566-0210 Fax

ATTORNEYS FOR HARVEY GULF
INTERNATIONAL MARINE, LLC,
EXPEDITORS AND PRODUCTION
SERVICES, INC., EPS CARGO
HANDLERS COMPANY, INC., AND
HORNBECK OFFSHORE SERVICES,
LLC

LUGENBUHL,    WHEATON,    PECK,
RANKIN & HUBBARD

By: /s/   Benjamin W. Kadden
    Stewart F. Peck
    LA Bar No. 10403, pro hac vice
    speck@lawla.com
    Christopher T. Caplinger,
    LA Bar No. 25357, pro hac vice
    ccaplinger@lawla.com
    Benjamin W. Kadden,
    Texas Bar No. 24077542
    bkadden@lawla.com
    Joseph P. Briggett
    LA Bar No. 33029, pro hac vice
    jbriggett@lawla.com
    601 Poydras Street, Suite 2775
    New Orleans, LA 70130
    Telephone: (504) 568-1990
    Facsimile: (504) 310-9195

ATTORNEYS FOR WARRIOR ENERGY
SERVICES CORPORATION,
WORKSTRINGS INTERNATIONAL,
L.L.C., SUPERIOR ENERGY SERVICES,
L.L.C., D/B/A SUPERIOR COMPLETION
SERVICES, FASTORQ, L.L.C., AND
STABIL DRILL SPECIALTIES, L.L.C.,

LISKOW & LEWIS

By: /s/   Michael D. Rubenstein
    Michael D. Rubenstein (Bar #24047514)
    First City Tower
    1001 Fannin Street, Ste. 1800
    Houston, Texas  77002
    Telephone:  (713) 651-2953
    Facsimile:  (713) 651-2952
    Email: *mdrubenstein@liskow.com*

ATTORNEYS FOR CHAMPION
TECHNOLOGIES, INC. AND OFFSHORE
ENERGY SERVICES, INC.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the above and foregoing was served on the 17th day of March, upon all counsel of record via the Court's electronic case filing system (ECF).

By: <u>/s/ *Kenneth Green*</u>

i:\client\schl1202-atp oil main file\bankruptcy\adversary\adversary #12-03443 ngp(oha)\pleadings\response to motion to dismiss\joint response to motion to dismiss redline all 3-17.docx

## INDEX OF AUTHORITIES

**Cases**

*Acme Energy Servs., Inc. v. Heritage Consol., LLC* (*In re Heritage Consol., LLC*), 765 F.3d 507 (5th Cir. 2014) ........................................................................................................................ 23

*Ashcroft v. Iqbal*, 556 U.S. 662; 129 S. Ct. 1937 (2009) ........................................................... 17

*Bayou Contrs. v. Brown*, 693 So. 2d 1249 (La. App. 1st Cir. 1997) ............................................ 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................ 16

*Bonn Operating Co. v. Devon  Energy Prod. Co.,*  613 F.3d 532 (5th Cir. 2010) ........................... 2

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) ....................................... 16

*Cutting Underwater Techs. USA, Inc. v. Con-Dive, L.L.C.*, No. 09-387, 2011 U.S. Dist. LEXIS 29325 (E.D. La. March 22, 2011) ..................................................................................... 11, 28

*Exxon Corp. v. Maryland Cas. Co.*, 599 F.2d 659 (5th Cir. 1979) ............................................... 17

*Fontenot v. Sun Oil Co.*, 243 So. 2d 783 (La. 1971) .................................................................. 19

*Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388 (5th Cir. 2006) ...................................................... 2

*Freeman v. Block "T" Operating, LLC*, 118 So. 3d 1279 (La. App. 3d Cir. 2013) ...................... 23

*Frey v. Amoco Prod. Co.*, 603 So.2d 166 (La. 1992) ................................................................. 19

*Grasso Prod. v. BMO Fin.* (*In re Century Offshore Mgmt. Corp.*), 83 F.3d 140 (6th Cir. 1996)  18

*Guichard Drilling Co. v. Alpine Energy Servs., Inc.,* 657 So. 2d 1307 (La. 1995) ...................... 28

*Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co.* 63 So. 3d 159 (La. App. 2d 2011) ............. 2

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ................................... 17

*J.S. Abercrombie Co. v. Lehulu Oil Co*, 160 So. 126, 126 (La. 1935) ........................................ 25

*JHJ Ltd. I v. Chevron U.S.A. Inc.*, 617 F.Supp 729, 732 (M.D. La. 1985) ........................... 25, 28

*Kimbell v. United States*, 371 F.3d 257 (5th Cir. 2004) .............................................................. 2

*Kirschner v. Agoglia* (*In re Refco Inc.*), 476 B.R. 75 (S.D.N.Y. 2012) ....................................... 31

*L.P. Commercial Corp. v. Caudill*, 870 F. Supp. 743 (S.D. Tex. 1994) ........................................ 17

*Lor, Inc. v. Martin Exploration Co*, 489 So. 2d 1326 (La. Ct. App. 1986) ............................ 25, 28

*Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997) ................................................ 17

*Murray v. A&T Well Serv.* (*In re Leeward Operators, LLC*), 2012 Bankr. LEXIS 1215 (Bankr. W.D. La. Mar. 21, 2012) ........................................................................................... 19

*Ogden Oil Co. v. Servco*, 611 F. Supp. 572, 576 (Dist. M.D. La. 1985). ..................................... 29

*Online Resources, Inc. v. Stone Energy Corp.* No. 99-2006, 1999 U.S. Dist. LEXIS 17057 (E.D. La. Oct. 29, 1999) ....................................................................................................... 2

*Phillips Petroleum Co. v. Best Oilfield Servs., Inc.*, 48 F.3d. 913 (5th Cir. 1995) ....................... 28

*Pinnacle Operating Co. v. ETTCO Enters.*, 914 So.2d 1144 (La. App. 2d Cir. 2005) ............... 19

*Quality Fin. Co. of Donaldsonville, Inc. v. Bourque*, 315 So. 2d 656 (La. 1975) ........................ 19

*Reed v. Linehan* (*In re Soporex, Inc.*), 463 B.R. 344 (Bankr. N.D. Tex. 2011) ........................... 31

*Scheuer v. Rhodes,* 416 U.S. 232 (1974) ..................................................................................... 17

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ......................................................... 17

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ..................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .............................................. 17

*Total E&P USA, Inc. v. Kerr-Mcgee Oil & Gas Corp.*, 719 F.3d 424 (5th Cir. 2013) ............... 19

*United States ex rel. Steury v. Cardinal Health, Inc*., 625 F.3d 262 (5th Cir. 2010).................... 30

*Wellness Int'l Network, Ltd. v. Sharif* (*In re Sharif*), 575 U.S. ___ (2015) (slip op. at 19-20, n.13), 2015 WL 2456619, at *12, n.13 (May 26, 2015) .................................................. 30

## Statutes

28 U.S.C. §§ 1408 and 1409 ........................................................................................................ 2

28 U.S.C. §§ 157 and 1334 .......................................................................................................... 2

Fed. R. Civ. P. 12 .................................................................................................................... 1, 17

La. Civ. Code art. 3338 ........................................................................................ 22

La. Rev. Stat. 9:4861 ........................................................................................... 20

La. Rev. Stat. 9:4862 ........................................................................................... 20

La. Rev. Stat. 9:4863 ........................................................................................... 20

La. Rev. Stat. 9:4864 ........................................................................................... 22

**Law Review Articles**

Patricia H. Chicoine, Lien on LOWLA; It's a Privilege: Recent Revisions to the Louisiana Oil

    Well Lien Act, 57 La. Law Rev. 1133, 1150 (1997) .......................................... 2, 22